CROWN CORK & SEAL CO. OF BALTIMORE CITY v. ALUMINUM STOPPER CO. OF BALTIMORE CITY et al.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1901.)

No. 387.

1. PATENTS—VALIDITY—PRESUMPTION OF UTILITY.

The granting of a patent is prima facie evidence of the utility of the invention, which is one of the essential elements of patentability; and this is not negatived by the fact that the device is susceptible of improvement, or that like inventions are so far superior to it that they have entirely superseded its use. To sustain the defense of want of utility in a suit for infringement the defendant must show either that it is theoretically impossible for the device of the patent to operate, or demonstrate by clear proof that a person skilled in the art has endeavored in good faith to make the invention work, and has been unable to do so.

2. SAME—INFRINGEMENT—SUPERIOR UTILITY OF INFRINGING DEVICE.

Comparative utility between machines or processes is no criterion of infringement, and the fact that a defendant's device is simpler and produces better results than that of the patent does not tend to avoid infringement unless its superiority is due to a difference in function or mode of operation or some essential change in character.

3. SAME—PROOF OF INUTILITY—UNSUCCESSFUL EXPERIMENTS.

The object of the drawings filed in the patent office is attained if they clearly exhibit the principles involved, and a rigid adherence to dimensions therein shown is not required or expected if an intelligent mechanic skilled in the art would so proportion the dimensions given as to secure practical results. The inutility or inoperativeness of the device is not demonstrated by the fact that experiments made with material identical in form and proportion of parts with the drawings failed to produce successful results, and especially where it does not appear that the experimenter was desirous of success.

4. SAME—EFFECT OF NONUSER.

While the fact of nonuser is entitled to some weight upon the question of the utility of a patented device, it is of slight significance where the patent was but recently issued, its validity was questioned, and its use required the construction of expensive machinery.

5. SAME—ABANDONMENT.

Abandonment of an invention to the public which will defeat a subsequent patent therefor is not established by evidence that the inventor temporarily abandoned experiments which had to that time proved un-

successful, where he subsequently resumed them, successfully perfected the device, and applied for a patent therefor before any adverse rights accrued.

**6. SAME—DELAY IN PATENT OFFICE.**

Delay in obtaining a patent after the filing of the application, due to adverse rulings of the examiners which necessitate appeals, will not work an abandonment of the inventor's rights, where he proceeds with his case within the time limited by the statute, and ultimately succeeds in obtaining his patent.

**7. SAME—VALIDITY OF REISSUE.**

The decision of the examiners and board of appeals in the patent office sustaining the right of a patentee to a reissue, applied for within seven months after the issuance of the original patent, where the matter was fully contested for two years, and both parties were represented by able counsel, while not conclusive, is entitled to great weight.

**8. SAME—BOTTLE STOPPERS.**

The Painter reissued patent, No. 11,685, for a bottle stopper, which contains claim 5 additional to those of the original patent (No. 540,072), is valid. While such claim is broader than any claim of the original patent, it is within the invention therein stated, and the right to incorporate such claim was not lost by the delay of seven months after the issuance of the original patent before applying for the reissue as against another patent granted for a similar device in the meantime. but on an application filed before the issuance of the original patent to Painter.

**9. SAME—INFRINGEMENT.**

The Painter reissue, No. 11,685, for a bottle stopper (original No. 540,-072), which consists of a cup-shaped disk of tin, or other metal having permanent flexion, which is inserted in the neck of the bottle, and then expanded into a groove in such neck in which a gasket has been placed, thus making a tight stopper, covers a pioneer invention, and is entitled to a liberal construction. Claims 1, 4, and 5 are infringed by stoppers made in accordance with the Hall patent, No. 541,203, which embody the Painter invention by using merely a modified, but mechanically equivalent, form of disk.

**10. SAME—EQUITABLE ESTOPPEL.**

Within two weeks after the issuance of a patent to defendants they were notified by complainant of his claim that it was an infringement of a patent to him just previously issued. Within six months thereafter complainant applied for a reissue, which, after a contest by defendants, was granted. *Held*, that defendants were presumed to have knowledge of complainant's right under the law to a reissue, and, as they were also familiar with plaintiff's invention, they proceeded to manufacture under their patent at their peril, and could not claim that complainant was estopped to assert his rights under his reissued patent.

**11. SAME—SUIT FOR INFRINGEMENT—EQUITY—JURISDICTION.**

The jurisdiction of equity to entertain a suit to enjoin infringement and for an accounting is not defeated by the fact that claimant has not made use of his patent, where it was but recently granted, and the litigation was necessary to establish its validity, which was denied by defendants, so that no implication arises from such fact unfavorable to the complainant.

Appeal from the Circuit Court of the United States for the District of Maryland.

For opinion in court below, see 100 Fed. 849.

W. Cabell Bruce and Robert H. Parkinson (Wm. A. Fisher, on the brief), for appellant.

Albert H. Walker (W. E. Hoffman, on the brief), for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. Prior to the inventions hereinafter to be described, which are the subject-matter of this controversy, the common method of stopping bottles was with cork, wood, rubber, or some other resilient material inserted longitudinally into the neck of the bottle, and held there by its elastic lateral pressure in frictional contact with the circumference, supplemented, in cases where gaseous liquids caused internal pressure, by wire or twine on the outside of the bottle head. About the year 1876, William Painter, foreman of the machine shops of Murrell & Keizer, began experiments upon a device for bottle stoppers, which culminated years afterwards in patented inventions, the essential features of which lie in the forcible contact of a permanently expanded or flexed margin of a disk with the packing material held between the disk and bottle surface. A rough draught, purporting to show the original conception, drawn from memory by William Fifer, a workman then employed in the shops, but who has long since ceased any connection therewith, has been offered in evidence. These preliminary experiments, according to Fifer, were not successful. Fifer tells us that Painter said to him, "George, we'll have to try something else, as we can't get these bottles blown near enough to use this kind of cap;" and that he was then directed by Painter to "lay all the parts and tools that he had used on the shelf until after a while." We have no direct testimony as to the later experiments. Fifer found other employment, and Painter has not testified in the case; the record showing that at the time the testimony was taken he was, and had been for a long time previous thereto, subject to nervous prostration, unable to stand the strain of business and the excitement incident to a long examination and cross-examination. Robert A. Hall entered into the service of Murrell & Keizer as an apprentice about the year 1873, and, with the exception of about six months in 1889, has been continuously engaged in the machine shops under the direction of Lewis R. Keizer, who conducts the business under the firm name; his partner, Murrell, having long since died, and Keizer being the sole owner thereof. Hall worked under the direction of Painter, whose first application for a patent for a bottle stopper was filed June 5, 1885, and letters patent No. 327,099 were issued September 29, 1885, to William Painter and Lewis R. Keizer, to whom a one-half interest was assigned. This patent, with No. 449,822, application for which was filed March 7, 1890, covers what are known and may be hereafter referred to as the "Rubber Seal Patents." On October 12, 1885, Painter filed an application for the patent out of which this controversy arises. The history of the proceedings in the patent office will be hereafter referred to. Patent No. 540,072 was issued May 28, 1895, application for reissue of the same was filed December 26, 1895, and July 26, 1898, it was reissued as No. 11,685. On November 5, 1889, June 16, 1890, and May 19, 1891, Painter filed applications for other patents, which were issued February 2, 1892,—No. 468,226, No. 468,258, and No. 468,259. These last named cover what are known as the "Crown Seal Patents." Robert A. Hall filed his application for a patent for a bottle-sealing device February 28, 1894, and letters patent No.

541,203, issued June 18, 1895. All of Painter's patents were assigned to the Bottle Seal Company, of Baltimore, to whose rights and business the complainant company, organized and incorporated under the laws of Maryland in 1892, succeeded. The defendant Keizer was one of the organizers of the Bottle Seal Company, the stock in which he subsequently sold, but continues to receive a royalty of $2,000 or $3,000 a year from the complainant company on account of his interest in the rubber seal patent. All of the machinery for the making of the rubber seals and crown seals for the complainant company were manufactured in Keizer's shops under the direction of Hall from the date when those seals began to be used up to about the time of the obtaining of the Hall patent. This patent was assigned to the defendant company, a corporation organized under the laws of the state of Maryland, May 2, 1896. The defendant Keizer was the organizer and is the controlling stockholder and the active manager of this company, Hall being a stockholder therein. The complainant company manufactures and sells about 30,000,000 stoppers per annum; the defendant company, since its organization, has been engaged in manufacturing and selling its stoppers to a considerable extent,—the two being the only companies engaged in supplying the market with the bottle-stopping devices which originated with the Painter inventions. The bill of complaint was filed November 12, 1898, in the circuit court of the United States for the district of Maryland, in equity, and prayed for an injunction restraining the defendants from infringement, and for an account, etc. The answer denied the infringement, alleged want of novelty and patentability, attacked the validity of the reissue, charged abandonment, fraud, and perjury, and set up an estoppel. The court below held that there was no infringement, and ordered the bill dismissed on this ground, and a decree was entered accordingly, and the appeal from this decree brings the case here. It is necessary, under the practice in this class of cases, for this court to ascertain and decide whether the decree appealed from should have been rendered for the complainants or for the defendants; for, if it should conclude that the court below erred on the question of infringement, that conclusion will not avail the appellant unless it should also decide all the other defenses against the appellees. It will be convenient to consider these defenses in the order in which they have been presented by the learned counsel for the defendants, and, like him, we will use the terms "complainant" and "defendants" instead of "appellant" and "appellees."

First. It is claimed that the original and reissued patent, No. 11,685, is void for want of utility. Utility being one of the qualities necessary to patentability, the granting of the patent is prima facie evidence of it; and this is not negatived by the fact that the device is susceptible of improvement, or that like inventions are so far superior to it that they may entirely supersede the use of it. Comparative utility between machines or processes is no criterion of infringement, and comparative superiority or inferiority does not necessarily import noninfringement; nor does it tend to avoid infringement if the defendant's device is simpler and produces bet-

ter results, unless the cause is due to a difference in function or mode of operation or some essential change in character. Differences in utility do not necessarily import differences of invention. The burden is upon the defendant, in a case like this, to prove want of utility. He must show either that it is theoretically impossible for such a device to operate, or demonstrate by clear proof that a person skilled in the art to which the invention pertains has endeavored in good faith to make the patent work, and has been unable to do so; and it follows that such evidence is overthrown, or will be overthrown, if it is demonstrated by practical experiments of credible persons that they have succeeded in producing by the patent process the results claimed by the patent. The defendants have undertaken to show by the expert Lorenz that the patent is a failure; that, after experiments, he could not succeed in stopping bottles by following the directions of the patent; and the expert Hall, being the person heretofore referred to, has undertaken to show theoretically that it is a failure. Lorenz was admittedly not familiar with the art, in that he had had no practical experience in connection with bottle stoppers, and his experiments were conducted during a few hours on two separate days. It cannot be said that they proved any more than that a person not skilled in the art, and without the special tools which presumably would be devised for the purpose, was unable to accomplish practical results. The complainant's experts, Spear and Hawkins, testified that they had successfully sealed bottles in accordance with the patent, and the results of those experiments have been produced before the court. One of the reasons for the failure of the experiments of Lorenz and Hall may be found in the fact that they followed closely the directions in the drawing of the Painter patent as to the dimensions of the devices shown therein. The object of the drawings filed in the patent office is attained if they clearly exhibit the principles involved, and, in a case like this, rigid adherence to the dimensions thus exhibited is not required or expected, and, if an intelligent mechanic would so proportion the dimensions as to secure practical results, inutility is not demonstrated by experiments with material identical in form and proportion of parts with the drawings in the patent. The special reason assigned for lack of utility consists in the shortness of the flange of the cup which constitutes the bottle stopper, and increase in the length of the flange would cure the defect. That is so obvious that no inventive faculty need be invoked to suggest it, and the learned counsel for the defendants admits in his argument that the bottle stopper of Fig. 6 in the Painter patent can be made useful by sufficiently increasing the length of its flange so as to increase the depth of the cup. We cannot think that a decision adverse to the utility and operativeness of this invention could safely rest on the ill success of experiments made by those who were not specially skilled in the art, and where it is not obvious that they were specially desirous of making their experiments succeed. Another ground upon which the learned counsel for the defendants relies is the failure of Fifer's experiments under Painter's directions in 1876. It is a novel contention

108 F.—54

that admitted failures during the preliminary stage of experiments should be adduced as evidence of want of utility in the perfected invention. Some stress is laid upon the fact that the complainant has never done anything towards introducing either of the forms of bottle stoppers described in this patent, and the learned judge below seems to regard it as somewhat significant. This circumstance would seem to be entitled to some weight as tending to show that the patent was useless; but inasmuch as title to this patent was not finally secured until July 26, 1898, and the validity of it, in view of the contest made by the defendants, would have to be settled by litigation, common prudence would suggest delay in incurring the expense of providing the machinery and other appliances that would be necessary in order to put it upon the market; and as the complainant was and is supplying the market for this character of stoppers with sealing devices belonging to the same general class, some of them later in date of invention, and containing certain improvements and advantages that have popularity and which have created a demand that complainant is fully supplying, all of these considerations are adequate reasons for any delay in the manufacturing of sealing devices under this particular patent, and no implication of lack of practical operativeness or utility in the invention can be drawn from such delay.

The second ground of defense is abandonment. Undoubtedly, an inventor may give to the public the benefits of his ingenuity as persons may give away any other kind of property, and such relinquishment may be either direct or it may be inferred from circumstances. Where there is an entire abandonment of all expectation of succeeding in an invention and securing a patent under circumstances that justifies the formation of the expectation that the ideas of the inventor will be always free to the public, and the inventor clearly manifests his intentions to relinquish any rights thereto, the inchoate right to the patent thus abandoned cannot be resumed. But the law does not favor forfeiture, and, it being a question of fact whether there has been abandonment, all reasonable doubts must be solved in favor of the patent. There may be abandonment before application or thereafter. Under the first head, the sole reliance of the defendants is the testimony of Fifer, already cited, wherein it appears that the early experiments were unsuccessful, in that they only succeeded in getting one bottle to stand about 40 pounds pressure, that bottle being the only one of the proper size. Whether nonsuccess was due to the packing used in this experiment, which was of paper felt, or whether delay in consummating the work was due to inability then to procure suitable bottles, or whether further tests with better tools or more accurate workmen were required, or whether modification of the device in other ways was contemplated, or whether Painter, who was then a poor man, could not give the time necessary to perfect this invention, being engaged in developing his other patents, which have since proved valuable, is left to conjecture. But, whatever may have been the cause or causes of the delay, there is an entire absence of proof either that he abandoned the hope of success, or that he intended to abandon

the invention to the public. His assistant was directed to "lay all parts and tools on the shelf until after awhile." This manifests an intention to resume experiments "after awhile," and results show that he did so resume, and later experiments enabled him to so far perfect his invention that his patent was applied for before any adverse rights accrued. There is no proof or suggestion even that there was any public use or sale, or that any person except Fifer was informed of the abortive experiments. Experimental use for the purpose of testing the qualities of an invention is never public use, nor is there any proof that the delay operated to mislead others into taking up the invention and with greater diligence perfecting it. The case would be presented in a different aspect if another inventor had entered the field, induced by the supposed abandonment and misled by the delay. It is of no advantage to the public that an inventor should apply for his patent before he satisfies himself as to the best form in which to embody his invention, and the statute which provides that two years' public use shall work a forfeiture clearly has no application to a case of merely uncompleted experimentation. Mr. Justice Swayne, in Wood v. Rolling-Mill Co., 4 Fish. Pat. Cas. 550, Fed. Cas. No. 17,941, says, "where it had not been abandoned to the public, and had not been in public use or on sale with the consent and allowance of the inventor, no lapse of time, however protracted, barred an application for a patent, nor, after it had been granted, affected its validity." Numerous cases are cited to support the proposition, but it is so well established that we will not swell this opinion by citing them. In that case the invention was made in 1835; the patent was not taken out until 1851.

Again, it is strenuously urged that the delays in the patent office pending the application worked a forfeiture. The record shows that the inventor encountered serious difficulties in the securing of his patent, successive objections being interposed by the examiners, necessitating appeals. In each case, however, the necessary steps were taken within the two years limited by the statute, and during the long period which intervened between the filing of the application and the issuance of the patent, although there are abundant signs of discouragement, there are none of abandonment, for towards the end of each period of limitation he resumes the struggle, and, although often stricken down, he did by successive appeals, and in strict conformity with the requirements of the statute, at last succeed in establishing his right to the patent. The argument of the learned counsel assumes that the inventor is under some sort of obligation to give the public the benefit of his invention as speedily as possible, and that he is in fault for any avoidable delay. The inventor does not determine the measure of his rights or of his obligations. The law determines that for him, and, if the government thinks that more speed is desirable in the interest of the public, it should change the law; the courts cannot do so. Nor can they exact of inventors any degree of diligence other than compliance with the statutory provisions, official regulations, departmental requirements, and formal demands which are prescribed by

and for the officials and others charged with duties under the patent laws. Certain fixed periods are provided in sections 4894 and 4904, Rev. St., for securing progress in applications for patents. If the inventor is allowed two years after a judgment against him within which to take appeal, he may wait until the last day of the two years. If congress thinks this is too long a time, it should fix another limitation, but courts cannot deny the benefits which the statute gives. There are no special reasons for invoking that power in this case if we had it, for it does not appear that during all these years of delay any other inventor was attempting to enter the field. This whole subject had full consideration in U. S. v. American Bell Tel. Co., 167 U. S. 224, 17 Sup. Ct. 807, 42 L. Ed. 144, where there was a delay of fourteen years in the patent office. Nor can forfeiture be predicated upon failure to put the patented device upon the market. In some countries, patentees are required to manufacture within a certain period after the granting of the patent, but there is no such requirement in our statute. Nor is this a mere paper patent, bought up only for the purpose of being laid away until it should be brought forth against a rival, as we have already shown in setting forth the reasons which explain and excuse the delay in putting this device upon the market.

The third defense is that there was no legal foundation for the surrender and reissue of the original Painter patent, and therefore the reissue is void for want of jurisdiction in the commissioner to grant it. The fourth defense is that claim 5 of the reissued patent is void because it is broader than any claims in the original, and because it was not applied for until after the lapse of an unreasonable time. The fifth defense is that the said claim 5 is not for the same invention as the original patent. These three defenses relating to the reissue will be considered together. The jurisdiction to grant the reissue is found in section 4916 of the Revised Statutes, which provides that:

"Whenever any patent is inoperative or invalid by reason of a defective or insufficient specification or by reason of the patentee claiming as his own invention and discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident or mistake, and without any fraudulent or deceptive intention, the commissioner, on the surrender of such patent and payment of the duty required by law, shall cause a new patent for the same invention and in accordance with the corrected specification to be issued to the patentee," etc.

The words of this section are largely borrowed from the opinion of Chief Justice Marshall in Grant v. Raymond, 6 Pet. 243, 8 L. Ed. 376. In that case Grant had received a patent for an improved mode of manufacturing hat bodies in 1821, and four years thereafter presented a petition stating that the specification of his patent was defective, praying that it might be canceled and a new and correct one granted, embracing the improvements so far as they were set forth in certain new specifications; and, although at that time there was no statute authorizing such proceeding, the letters patent were canceled and a reissue granted, and the validity of this proceeding was sustained by the supreme court. A review of the earlier decisions of the supreme court would seem to show that

by "defective or insufficient specifications" was meant any failure either to describe or claim the complete invention upon which the application for the patent was founded, and that "inadvertence or mistake" was used in antithesis to fraudulent intent, and that the right to reissue depends upon any failure to make specifications and claims legally adequate to their purpose, if due to any cause except an intention to deceive. The defendants contend that there is no jurisdiction in the commissioner to reissue a patent except where the facts exist which the statute prescribes as the foundation for his action. There have been numerous decisions as to how far the decision of the commissioner as to the existence of the statutory grounds for reissue is conclusive, and in one of the earliest cases Justice Story, who participated in the decision of Grant v. Raymond, 6 Pet. 243, 8 L. Ed. 376, says:

"I very much doubt whether his decision is or can be reviewable in any other place or in any other tribunal unless his decision is impeached on account of gross fraud and connivance between him and the patentee, or unless his excess of authority is manifest on the very face of the patent; as, for example, if the original patent were for a chemical combination, and the new amended patent were for a machine. In other cases it seems to me, the law having intrusted him with the authority to ascertain the facts and grant the patent, his decision, bona fide made, is conclusive."

In Ball v. Langles, 102 U. S. 129, 26 L. Ed. 104, Justice Strong, in a case where the original patent was granted in 1856 and surrendered in 1869, and reissue granted in 1869 and 1870, uses this language:

"When the reissues of 1869 and 1870 were granted, the commissioner of patents had authority under the acts of congress to grant reissues only in certain specified cases. These were whenever a patent was inoperative or invalid by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error had arisen by inadvertence, accident, or mistake, without any fraudulent or deceptive intention. The commissioner was invested with authority to determine whether the surrendered patent was invalid by reason of a defective or insufficient specification, or because the patentee had claimed more than he had a right to claim as new, and, if he found such to be the case, and found, also, that an error had been due to inadvertence, accident, or mistake without fraud, his decision was conclusive, and not subject to review by the courts. But the law did not confer upon him jurisdiction to grant a reissue embracing new matter or a broader invention than what was revealed by the original specifications or drawings or models, except in some cases, where there was neither model nor drawing. A reissue for anything more is therefore inoperative and void. Accordingly this court has repeatedly held that if on comparing the reissue with its original the former appears on its face to be for a different invention than that described or indicated in the latter it must be declared invalid."

In Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783, decided in 1881, a patent for an improvement in lamps was granted in 1860 for 14 years, and extended 7 years longer. It was twice surrendered, and reissued once in 1873, and again in 1877. Mr. Justice Bradley, in delivering the opinion of the court, held that the court below was clearly right in holding that the invention specified in the reissued patent was not the same invention which was described and claimed in the original patent. He says: "It is manifest on the face of the patent, when compared with the original, that the sug-

gestion of inadvertence or mistake in the specification was a mere pretense, or, if not a pretense, the mistake was so obvious as to be instantly discernible in opening the letters patent, and the right to have it corrected was abandoned and lost by unreasonable delay." Further: "The pretense in this case that there was an inadvertence and oversight which had escaped the notice of the patentee for 15 years is too bald for human credence. He simply appealed from the judgment of the office in 1860 to its judgment in 1876,—from the commissioner and examiners of that date to the commissioner and examiners of this,—and upon a matter that was obvious upon the first inspection of the patent." And he animadverts upon the evils which had grown up under the practice which allowed patents to be so expanded and idealized years after their first issue, for hundreds and thousands of mechanics who had just reason to suppose that the field of action was open had been obliged to discontinue their employments; that the granting of reissues for such purpose was an abuse of power,—and says, "When this is a matter apparent on the face of the instrument upon the mere comparison of the original patent with the reissue, it is competent for the courts to decide whether the delay was unreasonable, and whether the reissue was therefore contrary to law and void." The court held in that case that the delay was altogether unreasonable, and that the patent could not lawfully be reissued for the purpose of enlarging the claim and extending the scope of the patent. This case is thought to mark a new departure by the supreme court in the line of strict construction of the right of reissue. It must be interpreted in the light of the special circumstances which gave rise to it, of the evils that had grown up under the loose practice theretofore prevailing, and the remedy required in the interest of the public. The evil to be corrected was this: Unscrupulous speculators, watching the development of successful inventions, could, in searching the records of prior inventions, find one which might embody the same principles, and, availing themselves of the opportunity given by the reissue law, embody in the older patent claims which it might have had, but did not, and the result would be that the owner of the later patent, who had spent time and money in the development of a profitable business, would be confronted with a patent earlier in date than his, but reissued later, which would completely control his business. This evil certainly demanded correction. Again, there was a presumption—and generally it was a fact—that what was not claimed was not invented by the patentee, and the public had the right to use what was not claimed, either because it had not been invented by the patentee, or because, by his own act, he had made it public property, if it was not so before. This case did not deny that a claim might be enlarged in a reissued patent, but held that there must be a bona fide mistake, and that there must not be unreasonable delay; any considerable lapse of time affording opportunities and temptations to commit fraud when the circumstances of the original application had passed out of mind. It is interesting to note, as a part of the history of the development of the law on this subject, that so great a judge

as Mr. Justice Miller, in Mahn v. Harwood, 112 U. S. 364, 6 Sup. Ct. 451, 28 L. Ed. 665, expressed his dissent from the opinions of the court in those cases, beginning with Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783, wherein reissues had been held invalid. In connection with Miller v. Brass Co. it may not be without profit to refer to the case of Giant Powder Co. v. California Powder Works, in 98 U. S. 126, 25 L. Ed. 77, where the opinion was delivered by Mr. Justice Bradley only a few years before, as illustrating what he means when he speaks of a reissue for a different invention. That case shows that the court fully recognizes the right to modify the claims so as to secure fully the invention described, or attempted to be described, in the original. The original patent was for a mode of exploding nitroglycerin; the reissue was for the composition; and the court says:

"It is impossible not to say that they are for an entirely different invention than that secured, or attempted to be secured, by the original patent. If the patent had not been for the mode or process of exploding nitroglycerin, but for a process of compounding nitroglycerin with gunpowder or other substances, and inadvertently omitted to claim the exclusive right of the substance so produced, the case would have been one of very different consideration. If the last patent differs from the first only in stating more clearly and definitely the real principles of the invention, so that those who wish to pirate it may not be allowed to escape with impunity through the imperfection of the language used in the first, there has arisen one of the cases for which it was the intention of the act of congress to provide."

And after pointing out the distinction that, in the case before the court, the processes described in the original had no connection with the compounds or mixtures which were patented in the reissued patents, and that the invention of one did not involve the invention of the other, the learned judge says:

"These specifications may be amended so as to make it more clear and definite, the claim may be modified so as to make it more conformable as to the exact rights of the patentee, but the invention must be the same. The legislature was willing to concede to the patentee the right to amend his specifications so as to fully describe and claim the very invention attempted to be secured by his original patent, and which was not fully secured thereby in consequence of inadvertence, accident, or mistake, but was not willing to give him the right to patch up his patent by the addition of other inventions, which, though they might be his, had not been applied for by him, or, if applied for, had been abandoned or waived. For such invention he is required to make a new application, subject to such rights as the public or other inventor may have acquired in the invention."

In Beach v. Hobbs, 92 Fed. 146, 34 C. C. A. 248, the circuit court of appeals, reviewing the decision of Judge Putnam in the same case, wherein he held, after reviewing the decisions, that the decision of the commissioner upon mere questions of fact resting upon the applicant's allegation as to inoperativeness and inadvertence will not be re-examined by the courts, says:

"If by reason of any inadvertence or mistake in the drawings or specifications a patent is rendered in part inoperative, and the patentee promptly applies for a reissue, and no substantial rights are affected or fraudulent intent charged, we think the commissioner has a right, under section 4916 of the Revised Statutes, to cause a new patent to be issued, and that under such circumstances his decision is conclusive. We know of no authority in conflict with this proposition."

In U. S. v. American Bell Tel. Co.; 167 U. S. 267, 17 Sup. Ct. 809, 42 L. Ed. 144, Judge Brewer, in delivering the opinion of the court in 1896, says:

"But, further, congress has established the patent office, and thereby created a tribunal to pass upon all questions of novelty and utility. It has given to that office exclusive jurisdiction in the first instance, and has specifically provided under what circumstances its decision may be reviewed, either collaterally or by appeal. As stated in Butterworth v. Hoe, 112 U. S. 50, 5 Sup. Ct. 25, 28 L. Ed. 656, that it was intended that the commissioner of patents, in issuing or withholding reissues, interferences, and extensions, should exercise quasi judicial functions, is apparent from the nature of the examinations and decisions he is required to make, and the modes required by law, according to which, exclusively, they may be reviewed."

In Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, decided in 1891, Mr. Justice Brown reviews the authorities, and states what is the settled rule of that court as to the power to reissue; and his summary is as follows:

"(1) That it shall be for the same invention as the original patent, as such invention appears from the specifications and claims of such original. (2) That due diligence must be exercised in discovering the mistake in the original patent, and that, if it be sought for the purpose of enlarging the claim, the lapse of two years will ordinarily, though not always, be treated as evidence of an abandonment of the new matter to the public to the same extent that a failure by an inventor to apply for a patent within two years of the public use or sale of his invention is regarded by the statutes as conclusive evidence of an abandonment of the patent to the public. (3) That this court will not review the decision of a commissioner upon a question of inadvertence, accident, or mistake, unless the matter is manifest from the record, but that the question whether the application was made within a reasonable time is in most, if not all, such cases, a question of law for the court. To hold that a patent can never be reissued for an enlarged claim would be not only to override the obvious intent of the statute, but would operate in many cases with great hardship upon the patentee. The specification and claim of a patent, particularly if the invention be at all complicated, constitutes one of the most difficult legal instruments to draw with accuracy, and, in view of the fact that valuable inventions are often placed in the hands of inexperienced persons to prepare such specifications and claims, it is not a matter of surprise that the latter frequently fail to describe with requisite certainty the exact invention of the patentee, and err either in claiming that which the patentee had not in fact invented, or in omitting some element which was a valuable or essential part of his actual invention. Under such circumstances it would be manifestly unjust to deny him the benefit of a reissue to secure to him his actual invention, provided it is evident that there has been a mistake, and he has been guilty of no want of reasonable diligence in discovering it, and no third persons have, in the meantime, acquired the right to manufacture or sell what he failed to claim. The object of the patent law is to secure to the inventors monopoly of what they have actually invented or discovered, and it ought not to be defeated by a too strict and technical adherence to the letter of the statute or by application of artificial rules of interpretation."

In Coon v. Wilson, 113 U. S. 268, 5 Sup. Ct. 537, 28 L. Ed. 963, the reissue was not founded on the invention described in the original, but upon an entirely distinct invention. The court, holding it invalid, says:

"In the present case there was no mistake in the wording of the claim of the original patent. The description warranted no other claim; it did not warrant any claim covering the bands not short or sectional. The description in the reissue is not a more clear and satisfactory statement of what' is described in the original patent, but it is a description of a different thing,

so ingeniously worded as to cover collars with continuous long bands, and which have not short or sectional bands. The original patent industriously excluded from its scope the continuous band."

That case did not deal with the question whether a patentee can reissue to properly claim the invention exhibited in the original, and included under the statement of invention therein, but with the question whether, under the circumstances there existing, he could properly reissue to embrace an invention that was not so included or exhibited. In the present case the reissue is strictly confined to the invention described in the original and included under the statement therein. It does not fall within the class of cases represented by Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783, or Coon v. Wilson, 113 U. S. 268, 5 Sup. Ct. 537, 28 L. Ed. 963, where a different invention is described in the claim, but in that other class where reissue is authorized by the plain terms of the statute and by a long line of decisions of the supreme court, where the patent had failed to clearly and adequately secure the invention upon which the original was founded, and where the unquestionable object and effect of the reissue was to cover an invention not covered by the original claims. In this class of cases there should not be applied a stricter rule of diligence than that applied by statute in case of public use before application for the patent, even if so strict a limitation as that is applicable. The suggestion in Miller v. Brass Co., and other like cases, of two years as the ordinary limit of reasonable diligence, was based not upon any such limitation in the statute, but upon the fact that the two years were allowed for amendments after action of the patent office, and two years was the limit of public use allowed before application for the patent. The learned counsel for defendants assumes that the subject is so simple that Painter should have discovered instantly, upon reading the original patent, the occasion for the reissue, if it existed. He forgets that what seems so simple and easy to him, a past master of the subject, was not so to a mere inventor, unskilled in the art of interpretation, who could not, upon a mere reading of his patent, determine what his claims covered. Painter had no hesitation and no doubt what his invention covered, and almost immediately upon the hearing of the issue of Hall's patent he said that it was covered by his invention; but it was not until he was advised by his lawyer that he learned that his claims were not commensurate with his invention, and there was no delay then in filing his application for reissue. Some allowance may well be made for an unlearned man, when we remember that in the recent case of Westinghouse v. Power-Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136, the supreme court itself required three hearings before it could determine the meaning and scope of the patent claims, and the record in this case shows that such learned experts as Gen. Spear and Mr. Walker differ radically as to what the claims of the original patent cover. The cases relied upon by counsel in support of his contention that an unreasonably long time passed between the granting of the original and the application for reissue are Miller v. Brass Co., where there was a delay of about

fourteen years; Mahn v. Harwood, 112 U. S. 364, 6 Sup. Ct. 451, 28 L. Ed. 665, where there was a delay of about four years; White v. Dunbar, 119 U. S. 52, 7 Sup. Ct. 72, 30 L. Ed. 303, where the delay was about five years; Hartshorn v. Barrel Co., 119 U. S. 674, 7 Sup. Ct. 421, 30 L. Ed. 539, where there was a delay of nine or ten years; Leggett v. Oil Co., 149 U. S. 293, 13 Sup. Ct. 902, 37 L. Ed. 737, which did not turn at all upon the question of delay in applying for the reissue, but was decided on other grounds which impeached the patent itself. The question of laches which arose in that case grew out of an alleged promise made in 1873, the bill seeking relief thereon not being filed until 1888; and Dunham v. Manufacturing Co., 154 U. S. 110, 14 Sup. Ct. 986, 38 L. Ed. 924, which turned, not upon any question of laches, but upon questions which have no application here, wherein the court decided that the patent had clearly not been infringed by the defendant. It will not be profitable to continue the citation of the numerous cases on this subject. Analysis of them will show that there is a distinction well marked between reissues broadening the claims of the original, but confined to the invention therein exhibited, which the courts sustain, and reissues that depart from the invention exhibited in the original and included under its statement of invention.

Where there has been an expansion of the patent to describe inventions substantially different from the original, covering nebulous combinations not exhibited therein, and where there has been protracted and unreasonable delay in face of the manufacture of articles not substantially covered by the original invention, the reissue has been held void; but the courts, recognizing the fact that the ordinary inventor is not usually skilled in technical rules of construction, and is apt to suppose that his claims protect him in the essential elements mentioned in them, and that these claims and specifications are usually drawn by men who are strangers to and ignorant of the art within which they lie, and that even skilled solicitors are not infallible in framing technical documents, have sanctioned reissues which permit the framing of claims adequate to secure the full benefits of the inventions designed to be protected by the patent laws. The essential justice of allowing such reissue was recognized by Chief Justice Marshall in Grant v. Raymond, 6 Pet. 243, 8 L. Ed. 376, before any statute was enacted, and the reissue in that case was sustained upon general principles of right and justice in face of the argument of Mr. Webster that the defendants had begun the infringing manufacture after the grant of the original, which was four years before the reissue, the result of which was to render them liable for acts not within the description of the invention contained in the original patent; it not being denied that the machinery of the defendants, while infringing the reissue, did not infringe the original. The argument for the plaintiff in this case could not be more strongly stated than it was in that opinion, and a brief statement of the facts will show that it falls within the principles which have governed the courts in sustaining reissues, and is free from the vices which have avoided them. After long years of contention in the patent office, during the progress of which

many of the claims were disallowed and eliminated, the patent was issued May 28, 1895. The Hall patent, application for which had been filed February 28, 1894, was issued June 18, 1895. On July 2, 1895, Painter requested Alexander to call on Keizer and inform him that Hall's patent was an infringement on his patent of May 28th. There is some discrepancy in the testimony of Alexander and Keizer as to the exact conversation that took place, and the precise language used is unimportant. It is certain that, within about a fortnight after Hall's patent was granted, Painter, believing that it was an infringement, took measures to notify Keizer, who was an old associate and friend, of his belief, and that Keizer received some sort of notice. Painter at that time was in ill health, broken down with nervous prostration, and shortly thereafter went abroad, where he remained until about the end of October. On November 8th, Keizer, who represented Hall, wrote to Painter, referring to the "semiofficial statement that you cover the particular device in a patent that you had in the patent office for a number of years. It is necessary that we canvass the matter, and I write to you personally for information." In reply, Painter informs him that he had intended and expected to have seen him in relation to the bottle stoppers, but that his nerves were not yet strong enough for any business excitement, and is constrained to hand over the matter of conference on the subject to others, but tells him very frankly that he claims that the stopper in question is his own invention, and consequently the property of the complainant company. Thereupon followed some correspondence and interviews with the patent attorneys in Washington on the subject, and Painter filed his application for reissue December 26, 1895. This application and the oath accompanying it set out every jurisdictional fact required to entitle him to a reissue. Keizer and Hall filed a protest against a reissue, and during two years the whole question was thoroughly discussed before the examiners and board of appeals in the patent office. An effort was made to defeat the original claims as well as that introduced by reissue. The learned counsel for the defendants, who testified as an expert in the case, bears testimony as to the great experience and competency of these officials; and while we do not go so far as to hold that their decision upon this point is conclusive, as some of the courts are manifestly inclined to do, we are of opinion that the decision of competent experts, made after a full hearing, where both sides had been represented by able counsel and not impeached by fraud or favoritism, has great persuasive force. It is argued here that the claim introduced by reissue is substantially the same as the third and twelfth claims in the original application. The comparison of this claim, which is No. 5 in the reissued patent, shows that it is vitally distinguished from them, and the testimony of a very competent expert, Gen. Spear, points out the distinction, and the board of appeals recognized it. It is also argued that claim No. 5 of the reissued patent is broader than any claim of the original patent. We are of opinion that this claim is germane to the invention exhibited in the original, and is included under the statement of invention of

the original. It does not exhibit any change in the nature of the invention described, and it simply gives a more adequate description of such invention, which enlarges the claim, but does not enlarge the invention. We are further of opinion that there has been in this case no unreasonable delay and no intervening right which forfeits or waives the right of reissue covered by the statute. The Hall patent was applied for in February, 1894, and the application for it could not have been induced by the limitations in the claims of the Painter patent, and there is no reason to believe that the course of the parties claiming under it was in any respect different from what it would have been if the original had been precisely in the terms of the reissue. Under all the circumstances of this case, the application for reissue was made within a reasonable time. No notice of any manufacture, use, or sale under the Hall patents was brought to the knowledge of Painter before his application for reissue, and there was no manufacture or sale or publicity such as to import notice to him. The case would be different if Painter had unreasonably delayed to assert his rights to reissue after such notice was brought home to him, and where his silence and inaction had misled other parties to their injury; and the fact that the original patent contained a statement of his invention which covered the subject-matter of the reissued claim, and that a reissue to fully secure the invention disclosed was authorized by law, was sufficient notice that this patent was subject to such right of reissue, which right was liable to be exercised at any time at least within two years. The spirit and terms of the law authorizing reissues would be defeated, and the obvious purpose of its enactment would be ineffectual, if we applied to this case those restrictions which some of the decisions apply to cases where there has been long delay in the application for reissue, and the obvious purpose of such applications has been to appropriate subsequent independent inventions not originally disclosed in the patent.

The sixth, seventh, and eleventh defenses, imputing fraud and perjury, were correctly dismissed by the court below as "not entitled to consideration." The fraud alleged in the sixth is that Painter had abandoned the alleged invention to the public nine years before he filed his application for the original patent, and concealed that abandonment from the patent office in making his application. As we have already held that there was no abandonment, this charge is too trivial for further notice. The fraud alleged in the seventh defense is that Painter made a false oath in his application for reissue in stating that the errors and omissions were due to inadvertence, accident, or mistake. In that application Painter states that the specifications were hastily drawn up by R. D. O. Smith, during a hurried visit of the deponent to Washington; that he retained no copy of the papers, and took it for granted that, if the papers and drawings should be found thereafter to be faulty, they could and would be corrected or amended; that, during the several years during which his case was pending, these errors or omissions wholly escaped his own attention, and he believes that they were unnoticed by his attorneys and by the

patent-office officials who acted upon it; that during that time he was engaged in developing another bottle-sealing system involving a previous invention, and was encountering many difficulties which almost completely absorbed his attention. There is no evidence before us that any of these statements are untrue. All of these papers were before the officials of the patent office, who had before them the record of the original application, and had the best means of determining whether the facts alleged in this application for reissue were as stated. They determined them in favor of the application, and granted the reissue upon the strength of the same evidence which counsel now invokes to support his charge of fraud and perjury. What has been already said upon the subject of reissue disposes of this ground. The eleventh ground is that the president of the company, in his verification of the bill of complaint, swore to certain statements therein contained, not as from information and belief, but positively, and that it was impossible that the statements were within the personal knowledge of such president. As these statements were not denied in the answer, and were sufficiently proved by recitals in the records and by other evidence, there is no merit in this defense.

The eighth defense raises the question of infringement, and, inasmuch as the careful and learned judge below held it decisive of the case, it demands a consideration to which we would not otherwise think it entitled, for we are clearly of opinion that the Hall patent is an infringement. None of the defendants' experts have disputed it, and the protest filed by Hall in the patent office against the reissue, and the long contest made by him and his attorneys against it, are in the nature of a confession, for, had he not apprehended that the invention was the same, it would be difficult to understand why so much effort and money should have been expended to prevent the reissue. A more detailed account of the Painter invention is required under this head than we have yet given. Our conclusion differs from that of the learned judge below mainly because we look upon the invention from a different point of view. He holds that "Painter's invention was not a new application of a scientific principle to obtain a useful result, but rather an improvement in material and mechanism of a known device." In our view it represents a distinctly original conception, so essentially unlike anything in the prior art that nothing earlier has been presented to us out of which the defendants could read the invention of the patent, or either claim of it. There was no known device which could be converted into the Painter invention of any improvement short of rejection of the entire plan. The answer of the defendants, it is true, stated that this patent was void for want of novelty, and referred to the prior invention of Young in Great Britain in 1848. This was urged by Hall's attorneys upon the attention of the officials of the patent office in the reissue proceedings, and held by the board of examiners in chief not to exhibit the Painter invention; and the defendants' own expert, Lorenz, testified that the Young patent was not a practical or operative device, and seems so far to have satisfied the learned counsel for defend-

ants on that point that the Young patent was not introduced in evidence. And the Lenglet patent, No. 229,537, which the court refers to as showing that Painter should not be treated as a pioneer inventor, seems to us rather to illustrate the originality of Painter's conception than to furnish grounds for restricting it. Of course, we do not mean that Painter's was the first device ever used for stopping the mouths of bottles, but it differs fundamentally from any preceding invention, and is in no sense an improvement incorporated on an existing device. In the Lenglet device there is no disk having permanent flexion or a packing to be compressed by such disk. Lenglet takes a jar with a corrugated neck, and inserts in it a cap of metal,—apparently of soft metal,—which is to be rolled into conformity to the corrugations of the bottle neck by a mechanism such as that illustrated in another Lenglet patent, and in order to supply the rigidity necessary to maintain this cap in that position he fills it with plaster, which is supposed to harden and form a solid support. There is no elastic packing used, and no suggestion of a disk of any kind possessing the rigidity or permanent flexion necessary to compress such packing into a groove. Nothing in the Lenglet patent either points in the direction of the Painter invention, or could suggest that a simple disk of metal combining with the rubber packing could form and maintain a hermetical seal against internal pressure. The fundamental conception of Painter's patent is a flange or rim of a cup-shaped disk which has permanent flexion, and the expansion of such disk against a gasket or other elastic packing in an annular groove within the bottle neck, the flexion of the disk at once compressing the packing of the groove, and locking the combined disk and packing against internal pressure.

Numerous patents were offered in evidence, presumably because they were supposed to have some bearing. Inasmuch as the astute counsel for the defendants did not refer to them in his very full and able argument, it will be scarcely necessary to do more than glance at them. The Watts patent, No. 326,696, does not involve at all the principles of construction and action of the Painter patent. In that it is true there is a groove and shoulder in the mouth of the jar, and the packing lies in the groove and upon the shoulder, but the cup is essentially different. It is not laterally expanded, and is not capable of lateral expansion, and has and can have no permanent flexion. The cap is clamped down by a removable clamp. In the Parker patent, No. 41,532, the disk acts like a solid plug, and crowds the packing ring laterally against the neck of the jar, and the patent expressly states that the disk is "unelastic." In the De La Vergne patent, No. 232,468, there is no disk having permanent flexion, or anything like it. There is simply a plug intended to be air-tight, which has a latch to lock it in place. In the Van Vliet patent, No. 275,793, there is no groove in the mouth of the bottle, and no cup-shaped disk having permanent flexion. In the Smith patent, No. 314,885, no imagination could convert a glass disk into a cup-shaped disk having permanent flexion, and there is cement or wax poured into an annular chamber around the edge

of the disk. Seibold's patent, No. 271,527, is for a cartridge where there is no groove nor any cup-shaped disk. In the Atwood patent, No. 351,730, there is no peculiar cup-shaped disk. It seems to be a device for holding in a cork, instead of being a substitute for a cork. In the Dennis patents, No. 295,234 and No. 295,235, there is no shoulder or groove, no cap in the first four claims, and no groove, cap, or packing in the fifth claim. They relate to improvements in gun wads. The principles and functions in all are entirely different, and they have only the shade of an unsubstantial resemblance. No other such device has been brought to our attention. It is true that none of the elements here referred to are in themselves new, but the invention consists in taking elements possessing different functions, and co-operating them in a different manner from any heretofore suggested. The testimony shows that the complainant corporation and the defendant company have no competitors in furnishing bottle stoppers which at all answer to the above description. About 30,000,000 of such bottle stoppers were put upon the market by the complainant company alone during the last year, and the fact that, until the Painter patents were issued, no other bottle stoppers of like character or based upon like principles were ever sold, is of itself strong evidence of the originality of the Painter devices.

The claims of the Painter patent charged to be infringed are as follows:

"(1) The combination of a receptacle having a groove in the inside of its mouth and a shoulder projecting inward beyond the wall of the mouth above the groove, and a cup-shaped disk or plate of material having permanent flexion, all operating as set forth."

"(4) The combination of a receptacle having a groove in the inside of its mouth, and a shoulder projecting inward beyond the wall of the mouth of the groove, a cup-shaped disk or plate of material having permanent flexion, and a packing or stopper beneath and retained by the disk or plate, all operating as set forth.

"(5) The combination, substantially as hereinbefore described, of a bottle having an interior groove in its mouth, a packing or gasket in said groove, and a disk or plate of material having permanent flexion, which confines the packing in said groove, and maintains it in tight contact with the adjacent surface of the groove."

The claims of Hall's patent are as follows:

"(1) The combination, substantially as hereinbefore described, of a suitable bottle having a throat affording a sealing contact surface, a hollow ductile metallic plug having a portion of its periphery expanded within the throat of the bottle, and having an accessible shoulder for engagement by a bottle opener, and a sealing medium, which is in contact with said sealing contact surface, and is securely maintained in its sealing position by said plug.

"(2) The combination, substantially as hereinbefore described, of a suitable bottle, a hollow, ductile metallic plug, which has a portion of its periphery expanded within the throat of the bottle, and has an accessible shoulder for engagement by a bottle opener, and a gasket which is interposed between the metallic plug and the bottle, and is compressed and maintained in its sealing position by said plug.

"(3) A bottle-sealing device, embodying in combination a hollow plug, composed of strong but ductile metal, and an annular gasket mounted peripherally on the plug, substantially as described, the whole being adapted to freely enter the throat of a suitable bottle, and to be secured therein with sealing function, by peripherally expanding the portion of the plug which is adjacent

to the sealing gasket, and the latter enabling the metal to be indented and strongly engaged by a bottle opener.

"(4) The combination, substantially as hereinbefore described, of a bottle having in its throat an annular shoulder, an annular packing or gasket, and a hollow, ductile metallic plug, peripherally expanded as described adjacent to said gasket and shoulder, and thereby not only compressing the gasket into sealing contact between the plug and the bottle, but also securing the plug and the gasket against displacement under internal pressure, and also affording within the plug an accessible shoulder for engagement by a bottle opener."

The defendants' stopper follows the same plan as Painter's, and uses the same elements, which co-operate in the same way to effect the same purpose. There is a change of phraseology in this: That what Painter describes as a "cup-shaped disk" is described by Hall as a "hollow, ductile metallic plug"; what Painter describes as "a material having permanent flexion" Hall describes as "strong but ductile metal"; what Painter describes as "packing" Hall describes as a "sealing medium." The walls of this cup-shaped disk or hollow plug are expanded in the same way into a like groove for an identical purpose, and assume practically the same shape after the compression. In Hall's, as in Painter's, the part of the disk or plug which enters the bottle neck is made slightly smaller in diameter than the bottle neck. The only important difference between the two is that in the defendants' there is an outward flange on top of the cup-shaped disk or plug, which is described as "an accessible shoulder for engagement by a bottle opener." This shoulder may serve an additional purpose, and may be an improvement on Painter's patent; but, even if it answers an additional purpose, it would not thereby escape infringement. The essential operation, which is the sealing of bottles by the expansion of strong and ductile material against a packing in the groove of the bottle neck, is the same. Gen. Spear, who, after long training in other careers, became an examiner in the patent office, passing through all the grades until he was commissioner, and who has devoted much of his life to examining mechanisms and patented devices, testifies that certain of defendants' devices in evidence correspond exactly to the three claims of the Painter patent; that those made with the outward projection of the flange instead of the inward projection of the shoulder correspond in substance with each of these claims, the outward projection of the flange in Hall's patent being the mechanical equivalent of the inward projection of the shoulder in the Painter patent. None of the experts examined by the defendants have disputed the testimony for the complainant on this point. The inward projection of the shoulder in the specification of the Painter patent seems to serve no other purpose than as a safeguard against the metallic plate falling below the groove if it should happen to escape from the expanding tool. In the defendants' patent this purpose is served by the contact of the disk with the shoulder in the bottle neck. In one the glass surface expands inward; in the other the metal surface is expanded outward, to secure the desired contact, and prevent the metallic disk falling into the bottle. The outward flare of the disk above the groove in

Hall's patent is the obvious equivalent of the inward projection of the glass below the groove in the Painter patent, this outward flare or accessible shoulder serving also the additional purpose of facilitating the opening of the bottles. Without producing the drawings of the patents and the exhibits, we doubt that the subject can be made more plain than by reproducing Gen. Spear's description of the defendants' sealing device as shown in the exhibits. He describes it as—

"A stopper consisting of a metallic plug of cup shape, having around its open end or margin an outwardly turned flange, and adapted to fit into the mouth of the bottle with the open end upward; that is to say, the bottom of the cup being downward when it is inserted in the bottle. When the stopper is inserted in the bottle, in order to effect a closure it is forced outward or expanded, and this outward forcing causes the metal of the stopper to enter into a peripheral groove formed around the wall in the neck of the bottle near the mouth. A packing consisting of a band of rubber is interposed between the metal plug and the wall of the groove, and is forced by the expansion of the metal into the groove and against the wall, and is held therein by the metal, which retains its expanded shape after it is subjected to the expanding pressure. The stopper is retained in the bottle by the metal forced into the groove, and the pressure upon the packing between the metal and wall of the groove forms a seal which retains the contents of the bottle. I find this construction shown and described in the patent referred to in the question [Painter's reissued patent, No. 11,685]. I find described and shown in that patent a bottle stopper consisting of material substantially inelastic, which is expanded in the mouth of the bottle, and which, when expanded, retains its shape and holds its stopper in the bottle. Two forms of this stopper are shown in the patent and illustrated in the drawings. Both forms are cup shaped; both are expanded in the mouth of the bottle, and in expanding are forced into a peripheral groove near the mouth of the bottle. In the form shown in the first four figures of the patent the cup-shaped stopper is inverted. In the form shown in Figs. No. 5 and No. 6 the bottom is downward. The form of the stopper which is used with the bottom downward is shown in Fig. No. 6, and consists of a shallow cup, described in the specification as being made of malleable metal, substantially inelastic, such as commercial tin. A packing is inserted in the mouth of the bottle and located in the groove, and, when the cup-shaped stopper is expanded therein, the walls of the cup are forced into the groove by a lateral movement of an expanding tool shown in Fig. No. 5 of the drawings of the patent, and thus the metal is forced against the packing interposed between the cup and the wall of the groove, and the packing is compressed between the cup and the side wall, and a seal thereby formed, while the cup is held in the mouth of the bottle by its contact with its groove. The construction so far described I find in these exhibits."

After further description in reply to a question whether the improvements in stoppers for bottles mentioned in the statement of invention of the complainant's patent are substantially embodied in defendants' seals, he says:

"The statement of invention found in the second paragraph of the complainant's patent appears to be a very broad one, and is stated in comparison with the prior state of the art existing at the time of the application of the patent. It lays an especial stress upon the stopper made of substantially inelastic material expanded within a bottle's mouth, and by reason of the nature of the material remaining in the expanded shape when so expanded; this is in contrast with the old form, in which the material forming the seal was held against the bottle surface by pressure externally applied, and independent of the stopper itself. The exhibits are all included in this statement, and I find them included in the first, fourth, and fifth claims of the complainant's patent. Those claims included elements which I find in the ex-

108 F.—55

hibits, but the third claim is excluded by a clause therein which limits it to the 'concave side downward of the disk.' This arrangement I do not find in the exhibits."

Some stress is laid upon the fact that the inward projection of the shoulder in the exhibits showing the defendants' stopping device is very slight; but only a very slight projection is required if it is sufficient to arrest a disk that would pass through the bottle mouth, as that is the only purpose which it serves. But the defendants' circulars recommend an alternative and preferred form of construction,—the insertion of a gasket before the disk is applied. In such cases the gasket rests upon the lower shoulder of the groove, and is compressed against it by the expansion of the disk. The statement of invention in claim No. 5 of the Painter patent lays no stress upon that part of a construction requiring a shoulder, and does not refer to the relative diameter below the groove, and if claim No. 5 is so construed as to eliminate the shoulder, as we do construe it according to its plain words, the fact of infringement is so plain that in argument the defendants' counsel admitted that its "permanent gasket system" infringes, if his many objections to claim No. 5 are overruled. Reference to some of the decisions of the supreme court will show that infringement is not avoided by mere change of form, or renewals of parts, or reductions of dimensions, or the substitution of mechanical equivalents, or the studious avoidance of the literal definition of specifications and claims, or the superadding of some improvement. The court will look through the disguises, however ingenious, to see whether the inventive idea of the original patentee has been appropriated, and whether the defendants' device contains the material features of the patent in suit, and will declare infringement even when those features have been supplemented and modified to such an extent that the defendant may be entitled to a patent for the improvement. Clough v. Manufacturing Co., 106 U. S. 164, 1 Sup. Ct. 188, 27 L. Ed. 134, and Clough v. Manufacturing Co., 106 U. S. 178, 1 Sup. Ct. 198, 27 L. Ed. 138, illustrate such a case, where certain elements in a valve were held in one case to be equivalents of those in a former patent, and to infringe, yet were so modified and improved as to sustain a later patent. In Consolidated Valve Co. v. Crosby Valve Co., 113 U. S. 157, 5 Sup. Ct. 513, 28 L. Ed. 939, the improvements covered by the patents had been held by the court below to involve only mechanical modifications of the prior art, yet the supreme court regarded the Richardson invention as a "pioneer invention," and, although the defendant's valves departed widely from the terms of the claims in suit, it was held that they had secured under a change in form, and by the transposition from one member to another of certain functions, the substance of the complainant's invention, and the claim was construed to cover these modifications. Says the court (page 171, 113 U. S., page 521, 5 Sup. Ct., and page 943, 28 L. Ed.):

"Taught by Richardson and by the use of his apparatus, it is not difficult for skilled mechanics to take the prior structures, and so arrange and use them as to produce more or less of the beneficial results first made known by

Richardson; but prior to 1866, though these old patents and their descriptions were accessible, no valve was made producing any such results."

Richardson's invention was a safety valve, which, while it automatically relieved the pressure of steam in the boiler, did not, in effecting that result, reduce the pressure to such an extent as to make the relieving apparatus practically impossible because of the expenditure of time and fuel necessary to bring up the steam again to the proper working standard. His valve was the first which had a strictured orifice leading from the huddling chamber to the open air to retard the escape of steam, enabling the valve to open and to close suddenly with small loss of pressure in the boiler. In the infringing patent the valve proper was an annulus, and the extended surface was a disk. In Richardson's the valve proper was a disk, and the extended surface an annulus surrounding the disk. The defendant's had two ground joints, and only the steam which passed through one of them passed through the stricture, while in Richardson's all the steam which passed into the air passed through the stricture. The court says (page 179, 113 U. S., page 525, 5 Sup. Ct., and page 946, 28 L. Ed.):

"When the ideas necessary to success are made known, and a structure embodying those ideas is given to the world, it is easy for the skillful mechanic to vary the form by mechanism which is equivalent, and is therefore, in a case of this kind, an infringement."

These conclusions were based on the fact that no prior structure had produced the same result as Richardson's, although the court, of course, did not mean that Richardson had produced the first valve. In the case before us it is clear that no bottle-stopping device at all similar to those exhibited were ever in use before Painter's first invention. How easy it was for Hall, who commenced work under him as an apprentice, and for years was engaged in the same shop upon Painter's devices, to absorb the inventive idea, and to produce the same result by some equivalent method! Machine Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299, 32 L. Ed. 715, was for infringement of a patent for sewing on buttons. This was not the first button-sewing machine, but the court described it as a "pioneer machine," and held that it was infringed by a machine that made use of elements which were individually considered quite different from those in the patent, saying (page 290, 129 U. S., page 308, 9 Sup. Ct., and page 725, 32 L. Ed.):

"The mechanical devices used by the defendants are known substitutes or equivalents for those employed in the Morley machine to effect the same results. And this is the proper meaning of the term 'known equivalent,' in reference to a pioneer machine such as that of Morley; otherwise, a difference in the particular devices used to accomplish a particular result in such a machine would always enable a defendant to escape the charge of infringement, provided such devices were new with the defendant in such a machine, because, as no machine for accomplishing the result existed before that of the plaintiff, the particular device alleged to avoid infringement could not have existed or been known as such a machine prior to the plaintiff's invention."

An instructive case cited in this opinion is that of Proctor v. Bennis, 36 Ch. Div. 740, where Lords Justices Cotton, Bowen, and Fry delivered opinions. Sessions v. Romadka, 145 U. S. 29, 12 Sup.

Ct. 799, 36 L. Ed. 609, was for infringing a patent for a very simple spring catch for trunks; and although the court says that the mechanical devices used by the defendant, when individually regarded, differed considerably from those of the patentee, yet, as he was the first to make this particular kind of catch, he was regarded as a pioneer in the art, and therefore entitled to a sufficiently liberal construction of his patent to cover the defendant's methods. In another case the supreme court says, "Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself." It is useless to multiply authorities. The three cases cited show how far the supreme court has gone to protect what it calls "pioneer invention." The Painter invention is more distinctly a pioneer invention than any of these. It requires no specially liberal construction of it, however, to make it cover the defendant's devices. In a late case in the circuit court of appeals for the Sixth circuit, McCormick Mach. Co. v. Aultman, Miller & Co., 69 Fed. 371, 16 C. C. A. 259, the court says, "The rule as to infringement of pioneer invention, which points the way to new products or results, is analogous to that applied in cases of infringement of process patents in which the discoverer is only required to point out one practical method of using his process, and is permitted to claim tribute from all who thereafter use the process, whether with his apparatus or with a different or improved means;" and refers to Machine Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299, 32 L. Ed. 715, and other cases.

The ninth defense raises the question of equitable estoppel, arising out of the conduct of Painter, who, as alleged, stood by for nearly seven months and saw Keizer and his associates organize a company and expend large sums of money in the development of the Hall patent. We need not repeat what has been already said upon this point in the discussion of the questions raised upon the reissue. Within two weeks after the issue of the Hall patent, Painter sent a message to Keizer that he considered the Hall patent an infringement. A competent expert has testified that this patent infringed some of the claims of the original Painter patent. Keizer is presumed to have known the law which entitled Painter to a reissue. He was entirely familiar with the Painter inventions. He took his chances in the lottery of infringement, and has lost, and cannot be heard now to complain that he was misled.

The tenth defense is want of equity jurisdiction in cases of alleged infringement where the things covered by the patents have never been made or sold by the patentees. We have already disposed of this, in effect, in holding that the delay in manufacturing devices under this patent was explained by the litigation which impeached its validity, and that no implications unfavorable to the patentee arose out of such delay. The complainant company was supplying the market with bottle-sealing devices of Painter's invention of the same general type. The "Crown Seals" made under the patents of 1892 are adapted to serve the same purpose. In them the metallic disk is placed over and outside of the mouth of the bottle instead of being placed inside of it. This is a cup-shaped disk, which,

in form and function, is the same as shown in the patent in suit, made of material of the same kind, which stays in the form in which it is pressed. It is pressed into a groove, and by the same pressure the packing is held in contact forcibly with the surface of the bottle, the groove being outside instead of inside the bottle. The cases cited fall short of supporting this defense. In Hoe v. Knap (C. C.) 27 Fed. 204, the patented device was a small part of a complicated machine, which in other respects the defendants were entitled to use. The court did not refuse to entertain jurisdiction, but under the circumstances refused an injunction in the interlocutory decree, and allowed the defendants to use it on their giving bond. In the next case cited,—New York Paper Bag, Mach. & Mfg. Co. v. Hollingsworth & Whitney Co., 56 Fed. 224, 5 C. C. A. 490,—the decree of the circuit court which had taken jurisdiction was affirmed by the circuit court of appeals, but Judge Putnam in a short separate opinion expressed a doubt whether the case submitted was not one of mere legal right, wherein complainant should be left to his remedy at common law, if entitled to relief at all. But the same judge, in the later case of Packard v. Lacing Co., 33 U. S. App. 327, 16 C. C. A. 639, 70 Fed. 66, wherein it was asserted that the patent in issue was a "paper patent," and there were no proofs that the patented machines had ever been constructed or put into use, held that "the grant of the patent makes a prima facie case in this particular," and jurisdiction was entertained. In the other case relied on,—Germain v. Wilgus, 67 Fed. 598, 14 C. C. A. 561,—the bill showed that the right claimed by the appellants in regard to their patent was being contested in a court of law, and prayed that action be enjoined. The court held that "a party having legal rights, unless some interposing equitable right is presented, has a constitutional guaranty that the facts he presents for determination shall be tried by a jury," and, as they found no equity in the bill, it was dismissed. Some of the authorities cited deal with the question of the propriety of granting preliminary injunctions unless there had been a verdict of a jury or long acquiescence in the validity of the patent by the public. These have no bearing on the question of equity jurisdiction on final hearing. The principal case cited therein is Root v. Railway Co., 105 U. S. 189, 26 L. Ed. 975, where a bill merely for an account of profits and damages against an infringer was dismissed because it did not appear that there was not a complete remedy at law, but Mr. Justice Mathews in the course of his opinion, referring to the statute which expressly vests the court with jurisdiction "to grant injunctions according to the course and principles of courts of equity to prevent the violation of any right secured by patent" (now section 4921, Rev. St.), states the well-settled principles which fully sustained the jurisdiction in this case. See Shaw v. Cooper, 7 Pet. 292, 8 L. Ed. 689; Walk. Pat. § 106.

Upon the whole case, we are of opinion that the complainant is entitled to the relief prayed in the bill. The inventive idea whereby a bottle-sealing device of great economy of material, great facility in operation, and great stability in maintenance was secured by the joint and co-operating action of elements which had never before been combined to accomplish the same purpose or operate in the same

way. was entirely original with Painter. Nothing in the prior art affects his patent. The defendants enjoyed the unusual opportunity of presenting to the trained experts of the patent office every substantial defense which has been presented here. The original and reissued patents were granted in strict accordance with the law. The claims therein clearly cover the invention disclosed in the defendants' patent, and the infringement is so apparent that the experts called by them have scarcely disputed it. Painter's invention is not one of those great epoch-marking discoveries like that of printing, or the steam engine, or the electric telegraph, which opened to their inventors the portals of the Pantheon of the immortals. For such as these the love of fame and the glory of being benefactors of human kind served alike as motive and reward, but to the patient laborer in workshop and factory the incentive of fame and glory is absent. For them the stimulus of the rewards offered by our patent laws is needed to encourage by the hope of profit that zealous eagerness to improve processes, to remedy defects in machinery, to invent new methods and appliances for saving labor and cheapening production in the numberless articles that are in daily use. It is this stimulus that has made the American mechanic the most alert, observant, and studious of any in the world, and it is the indefinite multiplication of these small inventions and improvements that has wrought an industrial revolution and brought his country to the forefront of the world's commerce. It was the consciousness that in the knapsack of every private soldier there might be the baton of a marshal of France that inspired her soldiers to unparalleled achievements. In our unheroic, industrial age the central processes of a nation's life lie in production and distribution. The protection and hope of profit held out by our patent laws inspires that stimulating energy which leads to experiment, invention, and all the resulting benefits; a refusal of that protection in a proper case will deaden and destroy it. The decree of the court below is reversed, and the case remanded with instructions to grant the relief prayed for in the bill. Reversed.