AMERICAN PNEUMATIC SERVICE CO. et al. v. SNYDER et al.

(Circuit Court of Appeals, Third Circuit. July 29, 1910.)

No. 1,317.

1. PATENTS (§ 328*)—ANTICIPATION—VALIDITY—PNEUMATIC DESPATCH SYSTEM.
  The Bavier & Hawkes patent, No. 658,102, for improvements·in pneumatic despatch systems, *held* not anticipated and valid.

2. PATENTS (§ 173*)—CONSTRUCTION OF CLAIMS—PIONEER INVENTION—DOCTRINE OF EQUIVALENTS.
  The claims of a patent of a pioneer invention are entitled to some liberality in the application of the doctrine of equivalents.
  [Ed. Note.—For other cases, see Patents, Cent. Dig. § 248; Dec. Dig. § 173.*]

3. PATENTS (§ 328*)—INFRINGEMENT.
  The Bavier & Hawkes patent, No. 658,102, for improvements in pneumatic despatch systems, *held* infringed.
  McPherson, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of New Jersey.

Action by the American Pneumatic Service Company and another against William V. Snyder and others. Decree of dismissal (174 Fed. 152), and complainants appeal. Reversed, with directions.

M. B. Philipp, for appellants.
Henry P. Simonton, for appellees.

Before BUFFINGTON, Circuit Judge, and BRADFORD and McPHERSON, District Judges.

BRADFORD, District Judge. This is an appeal by the American Pneumatic Service Company and the Pearsall Pneumatic Tube and Power Company from a final decree of the circuit court of the United States for the district of New Jersey, in a suit in equity brought by the appellants against William V. Snyder, William V. Snyder, Jr., and Watson B. Snyder, trading as W. V. Snyder & Company, the appellees, dismissing a bill of complaint for an injunction and an accounting because of alleged infringement by the defendants of·letters patent of the United States No. 658,102, dated September 18, 1900, granted to Bavier & Hawkes for improvements in pneumatic despatch systems. No question of title to the patent is raised, and the suit was brought by the Pearsall Pneumatic Tube and Power Company, as owner, and the American Pneumatic Service Company, as exclusive licensee for the United States and the territories thereof. The patent in suit has two claims, both of which are alleged to have been infringed. They are as follows:

"1. A vacuo despatch system characterized by the combination of a line of tubing, an exhauster operatively connected therewith, and a terminal air-

inlet having a closure which automatically shuts the air-inlet when no carrier is being despatched and automatically opens same when a carrier is being despatched, substantially as described.

"2. The combination in a vacuo despatch system of a line of tubing, an exhauster operatively connected therewith despatch-inlets and discharge-outlets normally closed, and a terminal air-inlet on said line remote from said exhauster provided with a closure which is arranged to automatically shut the said terminal air-inlet when no carrier is being despatched, and automatically open it when a carrier is being despatched, substantially as described."

In the description the patentees say:

"Our invention relates to improvements in pneumatic-despatch systems, especially such as are used for the transmission of cash-carriers in mercantile houses. In particular the invention relates to improvements in that class of systems wherein a partial vacuum is maintained in the line by an exhausting-engine, as a pump, and which systems are known as 'vacuo' systems. The object of our invention is to attain the highest practicable economy in the operation of vacuo systems by reducing the duty of the exhausting-engine, which is hereinafter termed the 'exhauster,' to the minimum required for the service actually performed when moving the carriers through the line, and our invention effects this result by providing a system wherein the line is closed when no service is being performed—that is, when no carrier is being despatched—so that then all the duty put on the exhauster is to maintain the requisite slight vacuum in the closed line; but which system is also such that a terminal air-inlet opens to the necessary degree to maintain the requisite movement of air through the line when one or more carriers are being despatched. In the common vacuo system the extremity of the line farthest from the exhauster is always open and the exhauster is always required to do at least the work of moving the calculated volume of air through the line in the calculated time even if no carrier is in the line. Thus as in practice there are often considerable periods of time when no carriers are being despatched the work thrown on the exhauster is far in excess of what is needed to operate the line at those times when carriers are being despatched, and this unnecessary expenditure of energy renders such a system very wasteful of power. In our system, however, the air-inlet at the extremity of the line, called the 'terminal' air-inlet, is normally—that is, when no carrier is being despatched—closed, as are also the valves or flaps at each of the despatching-inlets and at the discharge-outlets of the carriers. Normally, then, ours is a closed system, wherein all the work required of the exhauster is to merely maintain the requisite slight vacuum in the line, and the closure at the terminal air-inlet is such, whatever may be its details of construction, as to automatically open, when a carrier is in the line, to such an extent that the exhauster will develop the requisite current in the line to move the carrier to its destination and will automatically close when all the carriers that were in the line have passed out of the line at their discharge-outlets. The invention, therefore, is not limited to any special closing device, but equally covers all such devices which, in combination with the line and the exhauster, close the line when no carrier is being despatched, and open it when one or more carriers is or are being despatched, thereby producing the economy of energy, at which our invention aims.  *  *  *  In our invention said terminal air-inlet is provided with a closure, which operates automatically in such a manner as to close the said terminal air-inlet when the exhauster is running but no carrier is in the line and to open the said terminal air-inlet when one or more carriers are in the line. Said closure can be constructed and arranged in many ways without departing from our invention, and we show two modifications thereof which work well in practice.  *  *  *  A very important result of the operation of the closure of the terminal air-inlet is that the speed of the carrier can never exceed that which attends upon the incoming of the air at such velocity as will close the ter-

minal air-inlet, for should the carrier reach or exceed this speed the terminal air-inlet will be closed, producing a vacuum behind the carrier which will immediately reduce its speed to such degree as to permit the air-inlet to open again, and we can regulate this speed by adjusting the valve at the terminal air-inlet, so as to obviate the danger of accidents when the carrier reaches the despatch outlets, which is a defect in present vacuo systems."

The drawings illustrating the patented apparatus are as follows:

With respect to them the patentees say:

"Figure 1 is a representation, partly broken and sectioned, of a vacuo system equipped with our invention. Fig. 2 is an elevation of one form of terminal air-inlet and closure, and Fig. 3 a view of the valve thereof from below. Fig. 4 is a vertical section of another modification of the terminal air-inlet and closure. Fig. 5 is an end elevation, on large scale, of the exhauster and engine which drives the same. Said figure also illustrates a convenient form of governor for controlling the exhauster according to the varying needs of the line. Referring to Figs. 1 to 3, inclusive, 1 is the line or circuit of tubing, connected in any usual manner with the exhauster 2. For convenience said circuit 1 is arranged as a loop, with the terminal air-inlet 3 near said exhauster 2. * * * Referring to Figs. 2 and 3, which illustrate one of said modifications, the terminal air-inlet consists of a cylinder 4, connected with a curved branch 5 of the line 1 by a depending tube 6. In the lower head of said cylinder 4 is an air-inlet opening with a conical valve-seat 8, on which seats a light ball-valve 10 of any suitable material, as a thin rubber globe. The valve-stem 11 is guided through spiders fixed in said cylinder, and a nut on the end of the stem limits the amount of opening of the ball. Fixed on said stem 11 is a circular perforated plate 13, and turning within desired limits of motion on said stem in contact with said plate 13 is a similarly-perforated damper 15, the degree of opening of said damper being limited by a pin working in a slot 17 in the hub of said damper 15, it being understood that said plate 13 has all but an air-tight fit in the cylinder 4, and just so as not to touch the periphery thereof. Thus by adjust-

ing the damper 15 the rate and friction of the incoming air and its tendency to raise and close the ball-valve 10 may be regulated as circumstances require. At suitable places along the line of tubing are despatching-inlets 20 20 for the insertion of the carriers and discharging-outlets 22 22, into which the carriers are shunted from the main line 1 and from which they are discharged in the usual manner. Said despatching-inlets are each closed normally air-tight by valves or flaps 24 which are normally held closed by the external air pressure, or by the usual springs or other devices, and said discharge-outlets 22 are each also normally closed air-tight by valves or flaps 26, which are normally held closed by the external air-pressure or by the usual springs or other suitable devices of such character that the impact of the cash-carriers when arriving at them will momentarily open the said valves 26 to permit said carriers to drop out, said valves immediately closing again automatically. Normally—that is, when no cash-carrier is in the line—the ball-valve 10 will be on its seat and all the valves 24, 26 will be closed, and all the duty the exhauster 2 need then do is to maintain the normal small vacuum in the line, thereby reducing its necessary duty to a minimum. Now suppose the valve 24 of any despatching-inlet 20 is opened to insert a carrier. This opening momentarily reduces the vacuum by allowing some air to enter the line, and the valve 10 drops from its seat, opening the terminal air-inlet, which, as will be apparent, is at the remotest point of the line, measuring through the tubing, from the exhauster, and therefore beyond any despatching-inlet, and any carrier that may be inserted into the line. There is now a movement of air through the line toward the exhauster, which when the cash-carrier is inserted moves said carrier toward the exhauster, and the valve 24 at that inlet where the carrier was inserted immediately closes. The pressure of the carrier introduces, as we have hereinbefore stated, additional resistance to the motion of the air, and valve 10 remains more or less open, allowing air to enter at the terminal air-inlet 3, to maintain the requisite current in the line to move the carrier through the line until it is discharged at the proper outlet. Immediately after the valve at the outlet closes the ball-valve 10 also closes and the exhauster again performs only its minimum duty. Suppose that while one carrier is traveling through another is inserted into the line. It may be either behind—that is, farther from the exhauster—or in front of—that is, between the first carrier and the exhauster. In the first case the insertion of the second carrier will not even momentarily have any practical effect on the first carrier; but the valve 10 may open a little more in accordance with the increased resistance in the line. In the second case, the motion of the first carrier will be momentarily arrested or checked, and then when the valve of the despatching-inlet at which the second carrier was inserted closes the first carrier will again proceed toward the discharge-outlet, in both cases, of course, the second carrier also moving through the line and valve 10 opening according to the resistance in the line. When the first carrier drops out of its discharge-outlet, the second carrier will be momentarily arrested or checked and then as the valve of the discharge-outlet closes will continue on its journey, the valve 10 adjusting itself to the reduced resistance in the line. Thus under all conditions the valve at the terminal air-inlet 3 adjusts itself to the conditions of service in the line and reduces the duty of the exhauster to minimum required for that service. Referring to Fig. 4, the depending tube 30 is preferably closed at its lower end, which has a small hole 40 and is provided with circumferential ports 31. A sleeve 34, provided with circumferential ports which in the open position register with the aforesaid ports 31, is preferably closed at the bottom and works with an easy approximately-tight fit on said tube 30, being stopped at its open-port position by a pin 36, which works in a slot 37. The ports and the weight of the sleeve are so adjusted that when no carrier is in the line the sleeve will be drawn up by the partial vacuum in the line and close the ports 31, but that when a carrier is in the line the sleeve will descend to more or less open the ports, according to the resistance in the line, the operation of this form of closure being the substantial equivalent of the ball shown in Fig.

3. Any suitable device may, of course, be used to automatically control the exhauster according to the varying needs of the line. A suitable governor is shown in Fig. 3 (5), consisting of a diaphragm 47 of the well-known type in communication by tube 45 with the line-tube 1. Said diaphragm 47 controls the valve 48 on the steam-pipe 51 by the lever 50, and said valve controls the speed of the engine 52, which drives the exhauster 2, so that when the terminal inlet-valve is opened, as when a carrier is in the line, the diaphragm 47 being raised by the spring 49, the valve 48 is opened and the engine and exhauster run at relatively-high speed, but that when the terminal inlet-valve and tube-line are closed, as when no carrier is in the line, the vacuum developed in tube 1 will draw down the said diaphragm, closing said valve 48 and slowing down the engine and exhauster."

There can be no question as to the utility of the apparatus of the patent in suit. Aside from its convenience, it is highly economical in reducing to a minimum the power necessary for the operation of a pneumatic despatch system within the limits of distance for which such patented apparatus is adapted. But the defendants deny the validity of the patent in suit on the ground of prior patents or other matter of an anticipatory character, and also deny that, on the assumption that the patent in suit is valid, they have infringed its claims or either of them. We shall first consider the question of the validity of the patent.

The combination of claim 1 relates to a vacuo despatch system, and consists of (1) a line of tubing, (2) an exhauster operatively connected therewith, and (3) a terminal air-inlet having a closure which automatically shuts the air-inlet when no carrier is being despatched, and automatically opens the same when a carrier is being despatched, substantially as described. The combination of claim 2 also relates to a vacuo despatch system, and consists of (1) a line of tubing, (2) an exhauster operatively connected therewith, (3) despatch-inlets and discharge-outlets normally closed, and (4) a terminal air-inlet on said line remote from said exhauster, provided with a closure which is arranged to automatically shut the said terminal air-inlet when no carrier is being despatched, and automatically open it when a carrier is being despatched, substantially as described. The meritorious and distinguishing feature of the apparatus of the patent in suit is its capacity to transmit carriers, not by means of air in the tubing compressed beyond its normal condition or density, nor by means of air in any portion or portions of the tubing so compressed in connection with air so rarified in other parts of the tubing as to constitute a partial vacuum. For such compression of air would involve waste of power and consequently unnecessary expense. It is the capacity of the apparatus to transmit carriers by means of air in the tubing so rarified between the carrier and its point of discharge as to constitute a partial vacuum, without any use of air in the tubing behind the carrier compressed beyond its normal external condition and thereby to reduce the expenditure of power to a minimum. When the apparatus is in a normal condition of rest, that is to say, not transmitting a carrier, the exhauster causes only a slight vacuum or rarification of the air in the tubing just sufficient to keep the valves shut. It is known as a closed system, for such it is in its normal condition. If any of the despatch inlets

were inadvertently or otherwise opened without the insertion of a car-
rier, the closure or valve 10 will automatically open, and then auto-
matically shut the terminal air-inlet 3. By arranging the tubing in a
loop as shown in Fig. 1, carriers may at the same time be despatched
in opposite directions. The terminal air-inlet is remote from the ex-
hauster, not necessarily in point of distance on a straight line between
the two, but with respect to the length of the tubing between them.

In the brief for the defendants many patents are referred to in
support of their contention that the patent in suit is invalid by reason
of direct anticipation or the prior art. Among these are U. S. patents
Nos. 570,161, and 624,201, to Fordyce; No. 367,386 to Given; No.
411,333 to Given and Kelly; Nos. 551,602, 582,829 and 640,020 to
Pearsall; No. 648,137 to Woodman; and No. 338,138 to Buell; in all
of which a pressure and not a vacuum despatch system is disclosed.
It is urged that it did not involve inventive genius to make such changes
in the apparatus of the above patents as to adapt them to the trans-
mission of carriers under a vacuum system such as that of the patent
in suit—that such alterations were within the competency of any one
skilled in the art. Doubtless had the apparatus in question been seen
and examined by those skilled in the art, as disclosed by the above
patents, and they had been asked to make such changes, they might
have done so. But this circumstance fails to overcome the presump-
tion of validity arising from the granting of the patent, coupled with
the nature of the changes necessary to be made to convert pressure
despatch system into vacuum despatch systems.

In addition to the above patents, the defendants rely upon U. S.
patents No. 652,960 to Foyer; No. 489,932 to Clay; the second certifi-
cate of addition to the French patent No. 97,158 to Crespin & La-
pergue; British patent No. 5,536 to Blakeney; and U. S. patents No.
431,699 to Leake, and No. 566,575 to Hazard. No one of the last
named patents discloses the combination of either of the claims of the
patent in suit. Patent No. 652,960 to Foyer, discloses a combined
vacuum and compressed air system, unlike the system of the patent
in suit in that no vacuum is produced throughout the length of the
system for forwarding and returning carriers wherever inserted in the
tubing, but, on the contrary, contains two independent transmission
tubes in one of which a partial vacuum is created to send carriers from
the salesman's station to the cashier's station, and in the other com-
pressed air is employed to return them from the cashier's station to the
salesman's station. The apparatus also lacks a closure for a terminal
air-inlet having the operation and results of the closure of the terminal
air-inlet of the patent in suit; nor does it disclose a terminal air-inlet
remote from the exhauster allowing carriers to be despatched in op-
posite directions in a loop line of tubing. Patent No. 489,932 to Clay
also discloses a combined vacuum and compressed air system. The
carriers are sent from subscribers' stations by means of a vacuum to
a central station, and are transmitted from the central station to the
subscribers' stations by compressed air in the tubing. In this system
only one carrier can be sent from one of the subscribers' stations at a

time. For if several carriers were inserted in the tubing, the delivery of the first would cause the introduction of compressed air which would return the other carriers to the outer or terminal station; whereas, in the apparatus of the patent in suit, although several carriers are inserted in quick succession in the tubing at any salesman's station, the terminal air-inlet valve will automatically open and remain open until all the carriers are delivered, when it will automatically shut: the direction of the air current not being reversed but always in a direction toward the exhauster. The apparatus of the Clay patent lacks a terminal air-inlet having the operation and producing the results of the terminal air-inlet of the apparatus of the patent in suit.

The apparatus of the above-mentioned French patent No. 97,158 to Crespin & Lapergue, with the exception of that shown in Fig. 2 of the second certificate of addition, discloses a purely pressure system for the transmission of carriers, termed "trains," through a long line of pneumatic tubing divided into a number of small sections; the carriers being moved successively through the sections by the pressure of air in excess of its normal external condition. A carrier propelled by compressed air will pass through and to the end of the first section; "thence it will pass into the second section, where, by its passage, it will close a door behind it, and will instantly open a valve," thereby admitting compressed air for its transmission through the second section, and so on until the carrier reaches the discharge-outlet. But in the second certificate of addition, the patentees refer to Fig. 2, as showing a good "vacuum relay," and say that "its operation consists in maintaining the line closed and emptying it of air as completely as possible in the intervals between the trains, opening the passage only at the moment the trains pass." Under this vacuum system, a carrier cannot be despatched whenever desired, as is practicable in the apparatus of the patent in suit, nor, as far as appears, can there be intermediate despatch-inlets. We do not find in the above mentioned apparatus a terminal air-inlet with a closure automatically shutting and opening such inlet, and having the operation or producing the results of either of the combinations of the patent in suit.

The British patent No. 5,536 to Blakeney clearly is not an anticipation of the patent in suit. There is a terminal air-inlet and an exhauster at each end of the line. Not more than one carrier can be sent from either end of the line at one time. After the insertion of a carrier in the sector, the latter has to be moved manually from an inclined to a vertical position, and finally if a sector accidentally or inadvertently is placed in a position proper for the despatching of a carrier, and the latter should not be inserted, the exhauster would cause the air to move through the tubing until such sector was manually replaced in its normal position of closure. The apparatus of the British patent also lacks despatch-inlets and discharge-outlets having the operation and producing the results of either of the combinations of the patent in suit. Patent No. 431,699 to Leake relates to tubular switches for transferring carriers from one to another line of tubing.

It is confined to switching mechanism. It does not disclose either of the combinations of the patent in suit.

Patent No. 566,575 to Hazard shows an apparatus under which air continues for a period of time to flow through the tubing when no carriers are being transmitted, and such flow will continue until a carrier is inserted in the tubing to be returned from the cashier's station to the salesman's station, thereby wasting power during that interval. The closure does not automatically operate upon the discharge of the carrier at the cashier's station, nor, as stated, until it is again inserted in the line of tubing. This apparatus thus lacks the terminal air-inlet with a closure automatically shutting such inlet when no carrier is being despatched, and automatically opening the same when any carrier is being despatched, and keeping it open until such carrier or other carriers in transit is or are despatched, when the closure again operates.

No one of the foregoing patents discloses a combination containing elements the same as or equivalent to all those of the combinations of the patent in suit, co-operating upon the same principle and performing the same function in substantially the same manner and producing substantially the same results. It appears from the file wrapper and contents put in evidence by the defendants that no reference was made in the patent office to any of the foregoing patents or any others as anticipating or otherwise affecting the validity of the application for the patent in suit. The only objection encountered in the patent office by the inventors was alleged want of utility; but this objection was properly withdrawn and the patent granted. We have no doubt of its validity. We further think that within a limited field it covers what may fairly be deemed a pioneer invention, and its claims are entitled to a somewhat liberal application of the doctrine of equivalents. Paper Bag Patent Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122. We are therefore brought to the question of infringement with which the court below solely dealt in deciding the case.

The parties agreed by stipulation made part of the record that the defendants December 10, 1906, "installed in their store in Newark, New Jersey," a pneumatic despatch tube apparatus identical with that shown and described in "complainants' exhibit, description and drawings of defendants' pneumatic despatch tube apparatus," and have continued the use of such apparatus up to the present time. The drawing which illustrates the defendants' apparatus sufficiently for all practical purposes in considering the question of infringement is Fig. 1, as follows:

Fig. 1.

In the description of the defendants' apparatus it is said:

"The drawings illustrate a Pneumatic Despatch Tube System of the class known as the 'Vacuo' or 'all sealed' system, wherein a partial vacuum is maintained in the transit tubes by means of vacuum producing machinery, and air is admitted to the transit tubes for driving carriers, through the end of the transit tube, called the bell-mouth, such air being controlled by a normally closed valve. This valve is located in the transit tube near the end of the transit tubes, most remote from the source of power, and is open only when carriers are being transmitted from one of a plurality of stations to another of said stations, there being two stations on each line of the transit tubes, the station near the 'bell-mouth end,' or end most remote from the source of power, being designated as the cashier's station, the other station being designated as a salesman's station. Figure 1 of the drawings is a diagrammatic view of a pneumatic despatch tube system of the 'all sealed type' with the operating parts in section showing the normal or closed position of the same.   *   *   *   Referring to Fig. 1—1 is a transmission tube connecting the cashier's station C with the salesman's discharge terminal 26 at the salesman's station S. 27 is a normally closed delivery valve, normally closing the opening in the discharge terminal 26. 1a is a transmission tube connecting the terminal 26 at the salesman's station S. with the discharge terminal 26a located at the cashier's station C and which terminal is normally closed by a delivery valve 27a through which the carriers are discharged into the receiving hopper 27b. 24 is a despatching inlet normally closed by the valve 24a and located at the salesman's station S, through which inlet carriers are inserted into the transit tube 1a. Ib is a tube connecting the terminal 26a with the vacuum drum or source of power Fig. 2, and which drum or exhauster is normally in communication with the transmission tubes 1 and 1a. 3 is a bell-mouth or end of the transit tube 1 through which carriers are inserted for transmission from the cashier's station C to the salesman's station S, and through which air is admitted for the driving of carriers from either station to the other and is located at the cashier's station C at a point most remote from the source of power. 5 is a casing or housing interposed in the transit tube 1 near the bell-mouth 3, and has mounted therein a valve 10, pivoted at 9, normally closing the transit tube 1 to the admission of external atmosphere. 4 is a cylinder attached to the housing 5 and carries mounted therein the piston 7 which is connected with and adapted to operate the valve 10 through a piston rod 8 and a link 8a, provided with a yoke 8c through which the piston rod 8 is slidably mounted, said piston rod 8 being retained in said yoke 8c by the retaining nut 8d. Said link 8a is also provided with a lug 8b located and adapted so as to come into contact with the upper end of piston rod 8 when the same travels upwardly. Said cylinder 4 is attached to a casing or housing 5 by means of the depending pipe 5a but communication between said cylinder 4 and said housing 5 is prevented by the head 5b through which the piston rod 8 travels. Said head 5b being provided with a stuffing box adapted to prevent leakage of air around said piston rod 8. A spiral spring 11 is interposed between the bottom of the cylinder 4 and the piston 6 and normally holds the piston 7 in the upper part of the cylinder 4. The lower part of the cylinder 4, below the piston 7, is connected with a small suction drum or header 2b, through a pipe 2a. This small suction drum or header 2b is connected to the main suction drum 2 by means of the pipe 2c, and a partial vacuum is normally present in the cylinder 4 both above and below the piston 7, and in the pipe 2a, the header 2b, the pipe 2c and the drum 2. The cylinder 4 above the piston 7 is adapted to communicate with the atmosphere through a port 12 normally closed by valve 13, pivoted at 14 upon the outside of said cylinder 4. 6 is a hollow column or cylinder connected with and in communication with the transmission tube 1 at a point near the valve 10 and between said valve 10 and the salesman's station. Said cylinder 6 having mounted therein a piston 6a normally held against the bushing or seat 6b by the action of the vacuum in the transmission tube 1. This piston 6a is adapted to drop by gravity away from its seat or bushing 6b, through a fluctuation of the vacuum in the transmission tube 1. Said piston 6a is provided with a short rigidly mounted piston rod 13a which

comes in contact with a lever of the valve 13, when said piston 6a falls by gravity (through being released from its seat by a fluctuation of the vacuum in transmission tube 1), and opens the port 12 and admits air to the top of cylinder 4 above said piston 7. Cylinder 4 is provided with a by-pass 15 connecting the top and bottom of said cylinder above and below the piston 7, the duct of said by-pass 15 is restricted and controlled by an adjustable timing valve 15a. 16 is a pipe connecting with and adapted to admit air to the top of the cylinder 4 above piston 7. Said pipe being normally closed by a valve 17 mounted in the bell-mouth 3 and having a trip 18 projecting into the bell-mouth. Said pipe 16 communicating with said cylinder 4 through the lower end of the depending pipe 5a at a point below the sealing wall or head 5b. The operation of the system is as follows:

The cashier or operator at the cashier's station, in despatching a carrier to the salesman's station S inserts the carrier into the bell-mouth 3. * * * When it engages and depresses the trip 18 opening the valve 17 and admitting air to the top of cylinder 4 above the piston 7, and, there being a normal vacuum beneath the piston 7, the air admitted to the top of said cylinder 4 by the opening of the valve 17 forces said piston 7 downwardly against the tension of the spring 11 and the said valve 10 is thereby opened by means of the said rod 8 and the link 8a connecting the said valve 10 with said piston 7. The opening of this valve 10 admits air into the transmission tube 1 beyond the seat of said valve through the bell-mouth 3 and the short section of the transit tube 1 interposed between the housing 5 and said bell-mouth 3, driving the carrier through said transmission tube 1 in the direction indicated by the arrow, towards the salesman's station S. The carrier having passed the trip 18, the valve 17 closes by its own gravity, or by a spring (not shown) provided for that purpose. The closing of this valve 17 shuts off the admission of air to the upper part of said cylinder 4, and the air that has remained in said cylinder and which had forced the piston 7 downwardly is gradually exhausted through the by-pass 15 by the timing valve 15a and through the pipe 2 and header 2b, pipe 2c and drum 2. As this air is exhausted, the spring 11 gradually raises the piston 7 and the piston rod 8 coming in contact with the lug 8b, of the line 8a, forces the valve 10 toward its seat or normally closed position, and by the time the carrier has discharged through the valve 27 at the salesman's station, the valve 10 has been moved into the path of the air current in the housing 5 sufficiently to cause it to be engaged by said air current and quickly exerted to its seat in advance and at greater speed than the travel of the piston rod 8. The closing of said valve 10 shuts off further admission of air to the transit tubes. The closing of this valve 10 is timed and regulated by the timing valve 15a. The full opening of this timing valve 15a permits the rapid exhaustion of the air in the top of said cylinder 4, and the consequent rapid rise of said piston 7 closing said valve 10, and the partial closing of said timing valve 15a retards the exhaustion of the air in the cylinder 4 thereby allowing said valve 10 to remain open for a longer period. In despatching a carrier from the salesman's station S to the cashier's station C the operator opens the valve 24a and inserts the carrier into the despatching inlet 24. * * * The opening of this valve admits air to the transmission tubes 1 and 1a causing a fluctuation of the pressure within said tubes, causing the piston 6a to drop by gravity from its seat 6b and the piston rod 13a comes in contact with the lever attached to valve 13 opening said valve, admitting air through the port 12 to the top of cylinder 4 above the piston 7. The piston 7 is now forced downwardly in the manner heretofore described in the operation of sending a carrier from the cashier's station to the salesman's station. The valve 10 is consequently opened admitting air through the bell-mouth 3 causing the carrier to be transmitted to its destination. The valve 24a at the salesman's station closes immediately after the carrier has been inserted into the inlet 24. The rush of the air current through the transit tube 1 when the valve 10 is open is such that a partial vacuum is created in the upper end of the hollow column or cylinder 6 (which is in communication with the transit tube 1) above the piston 6a, this partial vacuum causes the piston 6a to again rise to its seat 6b, thereby allowing the valve 13 to close, cutting off the admission of air to the top of cylinder 4 and allowing said piston 7 to close the

valve 10 in the manner heretofore described, so that when the air above said piston is exhausted from the top of cylinder 4 through the by-pass 15, regulated by the valve 15a, said valve 10 will be closed immediately after the discharge of the carrier and the system has resumed its former normal position. In the event that carriers are inserted for transmission at either station simultaneously or in such quick succession that more than one carrier is being transmitted at a time, an added quantity of air is admitted to the top of cylinder 4 through the opening of the valve 17, if the succeeding carrier is inserted at the cashier's station, or, the opening of the valve 24a at the salesman's station causes an interruption of the travel of the current of air in the transit tube 1, momentarily, and this momentarily destroys the vacuum in the hollow column or cylinder 6 above the piston 6a, and the piston 6a again drops downwardly from its seat 6b and opens the valve 13, admitting an additional quantity of air to the top of cylinder 4 above the piston 7 causing the opening of the valve 10, in the event the same has closed or partly closed, and the timing of the operation of said mechanism is again set to commence from the insertion of the last succeeding carrier."

Careful examination of the foregoing agreed statement of facts touching the construction and operation of the defendants' apparatus, in connection with the testimony, produces the conviction that the defendants have appropriated the very kernel and essence of the combination of the patent in suit. Without going into details we agree with the court below in holding that the defendants' apparatus contains the first two elements in both of the claims of the patent in suit, namely, "a line of tubing" and "an exhauster operatively connected therewith," and also contains the third element in the combination of claim 2, namely, "despatch-inlets and discharge-outlets normally closed." But the court below held that the defendants' apparatus does not contain the third element of the combination of claim 1, and the fourth element of the combination of claim 2 of the patent in suit, namely, in claim 1 "a terminal air-inlet having a closure which automatically shuts the air-inlet when no carrier is being despatched and automatically opens same when a carrier is being despatched," and in claim 2 "a terminal air-inlet on said line remote from said exhauster provided with a closure which is arranged to automatically shut the said terminal air-inlet when no carrier is being despatched and automatically open it when a carrier is being despatched." It is not disputed that the valve 10 of the combination of the patent in suit, or its equivalent, is in the terminal air-inlet of the defendants' apparatus, that it serves to shut from the transit tubes air of normal external pressure, and that the defendants' valve 10 is arranged to shut the terminal air-inlet when no carrier is being despatched and open it when a carrier is being despatched. But it is claimed that while valve 10 of the combination of the patent in suit automatically opens and shuts the terminal air-inlet, valve 10 of the defendants' apparatus does not automatically open or shut the terminal air-inlet.

We perceive no force in this contention. It is as unnecessary as it would be wearisome, in view of the agreed statement of facts, to discuss minor details of arrangement or construction of the closure mechanism in the defendants' apparatus, or to attempt a precise definition of the term "automatically." Four things are obvious: (1) that in the defendants' apparatus as in that of the patent in suit, an exhauster being common to both, the transmission of a carrier is due to the difference be-

tween air pressure in the transit tube, not above its normal external density, behind the carrier, and a partial vacuum in such tubing in front of it; (2) that in neither case does the apparatus gather and insert carriers into the tubing for transmission, but in both cases they must be manually inserted; (3) that in both cases the mere insertion of the carrier results in its transmission through the tubing by means of the partial vacuum in front of it created by the exhauster; and (4) that in both cases the opening and closing of the terminal inlet are caused by variation in air pressure in connection with gravity or its equivalent. The defendants' apparatus, therefore, notwithstanding some difference in its details of arrangement or construction is neither more nor less automatic than that of the patent in suit; the manual insertion of the carrier in either case being the controlling factor in the operation of the apparatus.

We think that undue significance was attached by the court below to the phrase "substantially as described." The complainants certainly are not by any descriptive language in the claims or either of them restricted to the precise form or forms of closure mechanism preferably set forth in the patent description. Nor does the description state directly or indirectly that the patentees were to be confined to such particular form or forms of closure mechanism. On the contrary the patentees say:

"The invention, therefore, is not limited to any special closing device, but equally covers all such devices which, in combination with the line and the exhauster, close the line when no carrier is being despatched and open it when one or more carriers is or are being despatched, thereby producing the economy of energy at which our invention aims. * * * Said closure can be constructed and arranged in many ways, without departing from our invention, and we show two modifications thereof which work well in practice."

Further, we have already said that the apparatus of the patent in suit was, within a limited field, a pioneer invention, and that the claims are entitled to some liberality in the application of the doctrine of equivalents; and we think, in view of the new and meritorious character of the combination invention of the patent in suit, that it involves no abuse in the application of that doctrine to hold that the combination of the defendants' apparatus contains elements the same as or equivalent to those of the combinations of claims 1 and 2, co-operating upon the same principle and performing the same function in substantially the same manner and producing substantially the same results. The timing valve 15a to regulate the discharge of air from the portion of cylinder 4 above piston 7, was necessitated by the peculiar and circuitous form of closure mechanism adopted by the defendants for the purpose, as it seems to us, of reaching substantially the same result as that secured by the closure mechanism of the patent in suit. But be that as it may, it does not change the essential constructive principle or function of the apparatus, and if an improvement, regard being had to the character of the invention of the patent in suit, its presence cannot avoid the charge of infringement.

In view of the foregoing considerations we think the court below erred in dismissing the bill, and that its decree must be reversed, with

costs, and with a direction for the entry of a decree in favor of the complainants for an injunction and an accounting as prayed for in the bill; and it is so ordered.

J. B. McPHERSON, District Judge. I agree that the patent in suit is valid, but feel obliged to dissent from the conclusion that the appellees have infringed. Upon this branch of the case I am satisfied with what Judge Lanning has said, and I would affirm the decree on his opinion.