### A. D. HOWE MACH. CO. v. COFFIELD MOTOR WASHER CO.

(Circuit Court of Appeals, Fourth Circuit. July 9, 1912.)

No. 1,067.

**1. PATENTS (§ 141*)—REISSUE—BROADENING OF CLAIMS.**

While a reissue may not claim an invention not clearly shown in the original patent, a reissue is not necessarily void because its claims are broader than those of the original.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 206–213; Dec. Dig. § 141.*]

**2. PATENTS (§ 138*)—VALIDITY OF REISSUE—LACHES.**

A delay of 7½ months before applying for a reissue is not of itself fatal to the reissue if rights of others have not intervened.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 201–203; Dec. Dig. § 138.*]

**3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—WATER MOTOR.**

The Coffield reissue patent, No. 12,719 (original No. 807,779), for a water motor, is within the scope of the original patent, was not anticipated, and discloses novelty and invention, being a pioneer in a limited field, and in such field entitled to a liberal construction; also, *held* infringed.

**4. PATENTS (§ 173*)—CONSTRUCTION—PIONEER PATENTS.**

A patent may be a pioneer in a wide field or in a narrow one.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 248; Dec. Dig. § 173.*]

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Wheeling.

Suit in equity by the Coffield Motor Washer Company against the A. D. Howe Machine Company. Decree for complainant (190 Fed. 42), and defendant appeals. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

H. E. Dunlap and W. R. Wood (John J. Coniff, on the brief), for appellant.

Richard J. McCarty, for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. The appellee was the complainant below. It charged the appellant with infringing reissue letters patent 12,719 granted November 12, 1907, to Peter T. Coffield, assignor of P. T. Coffield & Son. The original patent was No. 806,779. It was dated November 12, 1905. It was issued to Peter T. Coffield. It is not material to distinguish among the inventor, the complainant-appellee, and the various persons, firms, or corporations through which title passed from the former to the latter. The controverted issues are the same as they would have been had the original inventor never assigned the patent and had he brought this suit in his own name. For brevity, therefore, the one word complainant will be used to describe either the actual complainant or any person, natural or artificial, under or through which it claims title.

The appellant here was the respondent below. It will be referred to by the latter title.

For a full understanding of the present controversy, it will be necessary to refer to various things which happened before the incorporation of the respondent and when the business now carried on was conducted by Ralph W. Howe, either alone or in association with a certain E. J. Ornold, under the name of the A. D. Howe Machinery & Supply Company. It does not appear to be material for the purposes of this discussion to distinguish between the A. D. Howe Machinery & Supply Company and the A. D. Howe Machine Company. The term "respondent" as here used may mean either of them.

Among other things, respondent says that the claims of the patent in suit are void for want of patentable novelty. It is professedly for an improvement in water motors for driving light machinery; such, for example, as washing machines or other machines having a reverse motion. In practice it does not appear to have been used for any other purpose than to operate washing machines. In that connection it has gone into extensive use. Many thousands of motors have been sold and are at work. The demand for them appears to have manifested itself almost as soon as they were offered for sale. Whether they are novel in the sense of the patent law or not, they were new to the markets of the country. It is true that they were well and successfully advertised. Their large sale does not appear, however, to be due solely to the energy and ability with which they were brought to the notice of the public. They could be used in a way in which nothing else to be found in the shops could be. For that use many had need.

The motor is simple in construction and in operation. Any one, however stupid or careless, can use it. In practice it is so fastened to the cover of the washing machine that when it is put in operation it drives that machine. All the laundress has to do is to put suds

into a tub, place the clothes to be cleansed therein, close the cover, put the end of one of the pieces of hose attached to the motor on the water faucet, and the end of the other piece of hose in the sink or drain. She then turns on the spigot. The motor does the rest. It has few parts. They are durably constructed. It does not easily get out of order. It can be used under widely varying water pressures.

The presumption of the novelty of the device raised by the grant of the patent is in this case supported by the tests of the markets and of daily use. Is something claimed in this patent which is not found in any of its predecessors? Is that something the thing which makes this device a success in practice when those which went before it were not? Is the use to which it has been put one for which there was a widespread demand long preceding the date of the patent in suit? Is the device one which can be cheaply made and largely sold? If all these questions can be answered in the affirmative, the presumption becomes strong that inventive genius was shown in discovering the one thing needful. It may not even then be conclusive. The adaptation which turned failure into success may, after all, have called for nothing other than the handiness of the skilled mechanic. Still the world has long had thousands of skilled mechanics, if not hundreds of thousands of them. Wash day could not have become "blue Monday" without many of them appreciating how greatly it would profit to lighten laundry labor. If the way to do it were so plain that no spark of genius was needed to find it, why was it not found long ago?

What was it which, unknown before, complainant claims to have discovered? In the patent the inventor tells us what he wanted to do. He sought a water motor for driving light machinery having a reverse motion. This motor was to be positive and reliable in its operation. It was to be provided with means to prevent its stopping at any part of its stroke while under power. It was to work without attention. To attain these ends he took some things which were old and combined them with something which he says was new. Complainant says that he was right in so claiming, and it was this new thing which makes the device practically useful when all that had gone before was useless for actual daily work.

One of the old things which complainant's device contains is a hollow piston. It is the movement of this piston to and fro which transmits the power of the water pressure to the machinery to be operated. In order that the piston shall be made to move first in one direction and then in the other, it is divided into two noncommunicating chambers through which the water moves. Each of these chambers is supplied with an inlet and an exhaust valve. These valves are arranged to seat on either side of the chamber in which they are. Their seating and unseating is accomplished through the medium of valve stems which project through and beyond the chambers. When the piston has moved in one direction as far as the maker of the machine thought it necessary or desirable that it should, the further progress of the stems is arrested in some manner which will unseat the valves and throw the valve stems back so that the valves will seat on the other side of their respective chambers. The piston will, under the pressure of the water, reverse its direction.

This was all old when Coffield claims to have made his invention. It is fully described in the patent upon which the respondent chiefly relies as showing anticipation, viz., United States patent to Bergstrom, original No. 173,579, February 15, 1876, reissue 8,120, March 12, 1878. Indeed, there was nothing new about it even in Bergstrom's day, as the latter expressly admitted. What Bergstrom sought was a way of insuring that the valve should be regularly and certainly unseated and then promptly and certainly reseated. Before his time the valves were unseated by the contact of the valve stems, for which purpose the hollow piston rods were then used with the cylinder heads.. He asserted that the principal objection to the successful operation of that class of meters arose from the fact that under a light pressure or very small flow of water the movement of the piston shifted the valves so slowly that when they were partly opened the water would flow into the cylinder upon both sides of the piston simultaneously, thus balancing the. pressure and stopping the piston before the valves were seated. Bergstrom sought to avoid the difficulty by combining suitable springs or elastic cushions with the piston valves for the purpose of adjusting or seating them at each end of the stroke with a certainty of action. In his device all the work of seating and unseating the valves was done by the springs. He was trying to make a water meter. Whether his device would have been capable of successful use as such is not established. It does not appear ever to have gone practically into use for that or any other purpose. So far as this case is concerned, it may be assumed that the uses to which water meters and water motors are put are similar.

If what Coffield claims to have invented is to be found in Bergstrom's device or is described in Bergstrom's patent, this suit cannot be maintained. What does complainant claim that Coffield invented? It says that Bergstrom's machine would have been of no real value for work-a-day use. All the strain being thrown upon the springs, they would speedily lose their resiliency, if they did not break. If they were to be depended upon to do all the work, they would have to be adjusted, to some extent at least, to the widely varying pressures under which water reaches different kitchens and laundries. The complainant says that Coffield found out how he could get all the advantages sought by Bergstrom from the use of springs, and at the same time relieve the springs from the possibility of undue pressure and adapt the standard form of machine to use with almost any pressure likely to be found in any place in which there was a supply of running water. Such machines could be made one precisely like all the others. They could, as a consequence, be manufactured in large quantities very cheaply. They could be sold by any shopkeeper. No adjustment to the conditions of water pressure found in the purchaser's home would be required. These ends the complainant says were attained by the ingenious adjustment by Coffield of his springs and valve stems so that the heavy work of unseating the valves is done by the valve stems which, accordingly, bear most of the shock, while the springs finally complete the work of reseating the valves, a duty which Bergstrom

discovered the valve stems could not be safely depended upon always to do.

We are not prepared to say that the discovery that this could be done and the devising a way of doing it did not constitute invention.

We do not find it necessary to consider any of the other patents cited by respondents as anticipating that of complainant. Confessedly none of them are as pertinent as that of Bergstrom's. If Coffield's invention be defined and limited as we have defined and limited it, none of them foreshadow it.

Respondent says that whether Coffield invented anything or not is beside the mark. In any event, the reissue patent in suit is void. According to this contention, it is invalid because a second and broader claim was by the reissue added to the single claim of the original. In the original patent the claim read as follows:

"In a water motor, a cylinder having inclosing heads, a piston divided into two noncommunicating chambers, hollow piston rods communicating with said chambers, balanced exhaust valves lying on the outside of one of said chambers and seating against the outer side of the piston, said exhaust valves being connected to a common stem and having extensions beyond the valves, balanced inlet valves located within the other chamber, said inlet valves having stems projected on each side beyond the piston, coil springs carried upon the stems of said exhaust and inlet valves and adapted to impart the final movement to the valves after said valves have been given their initial movement by the contact of their stems with the cylinder heads, substantially as set forth."

This claim appears as the second in the reissue. In the latter the first reads as follows:

"In a water motor, a cylinder, a piston divided into two noncommunicating chambers, hollow rods communicating with said chambers, double-puppet inlet valves and double-puppet exhaust valves mounted in said piston, in combination with springs adapted to impart to said valves their final movements after being unseated, thereby reversing the travel of the piston."

[1] A reissue patent is not necessarily void because its claims are broader than those of the original. Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 857, 48 C. C. A. 72.

[2] The same case holds that a delay of 6 months and 28 days between the grant of the original and the application for the reissue was not of itself fatal to the latter.

The interval in this case is only 18 days longer. We do not think that the difference is great enough to be in itself, and apart from other circumstances, important. It is true that the reissue may not validly claim an invention not clearly shown in the original patent. Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 8 Sup. Ct. 38, 31 L. Ed. 100; Marvel Buckle Co. v. Alma Mfg. Co. (C. C.) 180 Fed. 1002, affirmed by this court without opinion 196 Fed. 1006, 115 C. C. A. —— (May 11, 1912).

Nothing of this kind has been here attempted. The added claim of the reissued patent would have been in place in the original. The description of the invention there given was quite broad enough to have supported it. Unless intervening rights which we are bound to consider arise between the grant of the original patent and the application

for reissue, there is no reason why the latter should not be held good. Respondent contends that there are such rights, and that because of them the patent in suit must fall.

[3] What are the facts? On July 21, 1905, E. J. Ornold wrote to complainant that he had chanced to see one of the latter's circulars describing its power washer. He said that he had had quite an experience with different washers, and that the complainant had a winner. He asked if complainant had any representative in the Wheeling, W. Va., territory. If it had not, he would like to have its best terms, etc. On September 18, 1905, an agreement was entered into between the complainant and Ornold by which the latter was given the exclusive right for five years to sell the complainant's machine in Ohio county, W. Va. It was agreed that Ornold should work that territory to the best of his ability and means and should forfeit all rights under the agreement if he or his assigns should attempt to sell any competing machines. In the same month of September, 1905, Ralph W. Howe, who, as before stated, was then trading as the A. D. Howe Machinery & Supply Company, saw for the first time one of complainant's machines. It was on exhibition at the West Virginia State Fair at Wheeling. Howe had then known Ornold for about four years. In October, 1905, the very month after Ornold made his written agreement with complainant and after Howe had first seen the Coffield motor, they began manufacturing a motor for the same purposes as those for which complainant's were made and sold.

When these facts, or some of them, came to complainant's knowledge, it put an end to Ornold's agency for it. In March, 1906, it brought an infringement suit against respondent in the court below. Some informal negotiations between the parties were then had. The respondent said that it had stopped, or would stop, making the infringing motor. In form this promise appears to have been kept. It told complainant that it intended in the future to make a form of motor, which in this case has been called No. 2. Complainant had no objection to respondent making such devices and selling them if it could. Respondent did make some of them. It never made many. Whether it ever intended to may be doubted. Complainant says that they never could have been a commercial success. If respondent ever purposed to make their manufacture and sale a business, it speedily changed its mind. The evidence shows that when complainant's suit was brought —that is, in March, 1906—respondent was still making and selling its earliest type, that which in the record is called No. 1. Respondent claims that as early as the last week of April, 1906, it put its third type upon the market. This last type is that at which the present suit is directed. Complainant denies that respondent sold any of this form called No. 3 until some months later. The evidence offered by respondent to prove that it did falls short of establishing it. If it were true it would seem that respondent would have been able to show the fact beyond peradventure. On the other hand, it is certain that as early as May, 1906, Howe and Ornold made application for a patent in which they described what is substantially the motor which they were making and selling at the time the present suit was brought. Upon

this application a patent, No. 841,649, was issued January 15, 1907. In respondent's brief, and in the oral arguments of its counsel at this bar, much was said about this patent. It does not appear to us that it has any material bearing upon the case.

In the patent in suit the drawings and descriptions show that the motor cylinder through which the piston rods pass are fixed, while the piston is movable. This feature of construction was not made an element of the single claim of the original or of either of the claims of the reissue patent.

In respondent's patent the piston was described as stationary, while the cylinder was movable. A stationary piston was made an element in four of the six claims. The particular kind of spring used was an element of the other two claims. If these features have patentable novelty and utility, the Howe and Ornold patent may be good. Whether they are or are not, respondent would have no right to use complainant's patented invention, with or without improvements. Respondent, however, relies upon this application for a patent and upon the making and selling of the present type of motor both, as it says, before complainant applied for a reissue, as showing that it had acquired intervening rights which could not be taken from it by anything which complainant might afterwards do.

As already stated, the fact that No. 3 motor was in any substantial sense put upon the market before complainant applied for its reissue is not proved. If it were, under the special circumstances of this case it would profit respondent naught. The evidence leaves no room for question that Howe and Ornold, from the time the former first saw complainants' device, set about appropriating it to their own uses. If, as often happens, Coffield has been so unfortunate as not to secure legal protection for his inventive idea, and as a consequence it became a part of the public domain, he and complainant must stand their loss. In that event Howe and Ornold, like everybody else, may freely use what Coffield invented but failed to keep. But nothing which Howe or Ornold *did* in this matter gained for them anything which could without misuse of language be called *rights*. In the atmosphere of a court of equity it usually takes longer than 7 months and 16 days for intentional wrongs to ripen into intervening rights.

We have already said that in the absence of such rights complainant is entitled to all that the reissue purports to give it. No other intervening rights than those of the respondent have been set up. If it acquired none, the reissue patent in suit is valid.

If the first claim of that patent be valid, there is no question that respondent's device infringes it. If the doctrine of equivalents be fairly applied, we think it infringes the second claim also. It is true that one of the elements of that claim is coil springs carried upon the valve stems. In respondent's device the spring is mounted on a movable buffer plate. It is with this buffer plate that the valve stems come into immediate contact. The buffer and the springs are, however, so arranged that precisely the same effect is produced as in the complainant's device. In each machine the springs and the valve stems are so arranged that the stems unseat the valves while the

springs complete the action of reseating them. This is not gainsaid. It is, however, contended: First, that the second claim of complainant's patent cannot be read on respondent's device, and, second, that complainant's patent is not entitled to a liberal application of the doctrine of equivalents, it being, it is said, in no sense a pioneer patent.

We have no wish to limit the salutary doctrine that a patent claim covers nothing upon which it cannot by a fair construction of its language be read. Such rule is not relaxed by holding that the words "carried upon" may be held applicable to springs which are carried back and forth by contact with these stems, although a movable buffer plate is always interposed between the stems and the spring, and although when the spring is not in use there may be times when the buffer plate is not in contact with the stems. By the action of the stems the spring is carried to and fro. There is nothing in the prior art which requires that the particular words in question shall be narrowly construed. Nor are we persuaded that respondent is right in its contention that the patent is so far from being a pioneer that it is not entitled to even a reasonable range of equivalents.

[4] A patent may be a pioneer in a wide field or in a narrow one. American Pneumatic Service Co. v. Snyder, 180 Fed. 725, 104 C. C. A. 78 (C. C. A., 3d Circuit).

Columbus discovered half a world. Another man may be the discoverer of a minute coral atoll. Each is a pioneer—one in millions of square miles, the other in a couple of acres. The right of discovery belongs to each in all that he has discovered.

Coffield did not invent water moters. He did not invent water motors of the general type of his device. In those fields of invention he is not a pioneer. He is merely an improver. On the other hand, he did originate something. He found out that such a type of water motor could be made to work successfully if the valve stems and the springs were so arranged that one would do the heavy work of unseating; the other complete the work of reseating. In that field he is the pioneer, none the less because the field itself may be small. He is entitled to protection for that which he has discovered. Respondent has invaded that field. It must take the consequences. It was open to it, as to the rest of the world, to have found some other way of making this type of water motor practically successful. The only thing which it could not do was to use complainant's way. Whether it uses that way or not depends upon whether it has in substance done what complainant in its patent describes and claims.

The decree below was right, and should be affirmed.